2000-NMCA-023

996 P.2d 922

**Harry DURAN, Ph.D., M.D.,**
**Plaintiff–Appellant.**

v.

**The  NEW  MEXICO  MONITORED TREATMENT PROGRAM and Gilles Marchal, Defendants–Appellees.**

No.  19671.

Court of Appeals of New Mexico.

Feb. 24, 2000.

Steven K. Sanders, Law Offices of Steven K. Sanders, Albuquerque, for Appellant.

Andrew G. Schultz, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for Appellee New Mexico Monitored Treatment Program.

Carl J. Butkus, Butkus & Reimer, P.C., Albuquerque, for Appellee Gilles Marchal.

## OPINION

PICKARD, Chief Judge.

{1} Harry Duran (Duran) filed suit against the New Mexico Monitored Treatment Program, Gilles Marchal (Marchal), and several other parties who are not subject to this appeal after he was fired from his position as chief resident in the University of New Mexico School of Medicine's (Medical School) division of neurosurgery. Duran had been chief resident in the neurosurgery division for approximately one year, when another neurosurgery resident told Duran's supervisor that Duran was addicted to alcohol. Duran's supervisor ordered Duran to seek substance-abuse counseling as a result of this accusation. Duran did so, signing an agreement to attend an addiction recovery clinic called the New Mexico Monitored Treatment Program (Program or MTP). Marchal, who is a counselor and an administrator for the Program, monitored Duran's compliance with the Program's requirements as set forth in the agreement. Duran complied with the agreement for a brief time, but then his level of compliance dropped significantly. The University of New Mexico Hospital (Hospital) fired Duran, in part, because of his failure to fully comply with the agreement.

{2} Duran believed the Hospital did not have cause to fire him from his position as chief resident in the neurosurgery division, so he filed suit. In his complaint, Duran set forth four specific causes of action against the Program and Marchal: (1) conspiracy

with public employees to violate his right to due process, (2) violation of his right of freedom of religion, (3) violation of his right of freedom from unreasonable search and seizure and right of privacy, and (4) interference in his contractual relationship with the Hospital. The trial court dismissed Duran's first three causes of action for failure to state a claim on the ground that the Program and Marchal are not state actors and, therefore, cannot be held liable for civil rights violations under the statutory and constitutional provisions set forth in Duran's complaint. The trial court dismissed Duran's fourth cause of action on summary judgment apparently on the ground that he consented to the Program and Marchal's disclosure of what otherwise would have been confidential information.

{3} On appeal. Duran claims the trial court should not have dismissed his first three causes of action because the Program and Marchal assumed the role of state actors by jointly participating with the Hospital's employees to deprive him of his constitutional rights and by accepting state-delegated authority to determine whether he would retain his job at the Hospital. Duran claims the trial court should not have dismissed his fourth cause of action because he revoked the agreement, along with its consent releases, before Marchal disclosed privileged information to the Hospital. We reject Duran's arguments and, for the reasons stated below, we affirm.

**BACKGROUND**

{4} In June 1994, the Regents of the University of New Mexico hired Duran as chief resident in the Medical School's division of neurosurgery. Duran entered into an employment contract with the Hospital, the term of which was to run from July 1, 1994, to June 30, 1995 (1994 Contract). The Hospital is operated by the Regents.

{5} Doctor Benzel acted as Duran's direct supervisor throughout the course of his residency at the Medical School. As chief of the Medical School's neurosurgery division, Benzel had the power and authority to recommend the hiring and firing of Duran, subject to concurrence by Dr. Hansbarger. Hansbarger, who was then the associate dean for graduate medical education at the

Medical School, had the ultimate power and authority to hire and fire Duran.

{6} In early January 1995, another resident in the neurosurgery division told Benzel that he believed Duran had a substance-abuse problem. As a result of this accusation, Benzel ordered Duran to seek counseling with Dr. Brashar at Lovelace Park Center. Benzel told Duran he could not resume his clinical duties until Brashar determined that he was in a condition to do so.

{7} In an effort to comply with Benzel's orders. Duran reported to Brashar, who determined that Duran was chemically dependent. Brashar told Duran he could clear his reputation by participating in the Program on a voluntary basis. The Program is an addiction recovery clinic. The Program is a private, non-profit corporation existing under the laws of the State of New Mexico. Duran wanted to clear his reputation, so he agreed to voluntarily participate in the Program.

{8} In late January 1995, Duran met with Marchal, who was a counselor and administrator for the Program. At the meeting, Marchal informed Duran that he could sign a voluntary contract to participate in the Program because the New Mexico State Board of Medical Examiners had not mandated Duran's participation in the Program. By participating in the Program on a voluntary basis, Duran could withdraw from the Program at any time.

{9} On the date of the meeting, Duran signed a voluntary agreement (Agreement) to participate in the Program. The Agreement stated in relevant part:

*Informing Key People in My Life of My History of Alcoholism and/or Chemical Dependency.*

\* \* \*

7. I agree to inform any doctor with whom I have any formal practice association of my history of alcoholism and/or chemical dependency and of the conditions of this Agreement. By the release set out below, I give this/these person/people permission to contact the MTP if there is ever

any concern about my using alcohol or drugs, or about my behavior, and *give permission for the MTP staff to contact this/these doctor(s), represented by Dept. of Neurosurgery.*

\* \* \*

*MTP Requirements.*

11. I agree to attend the weekly meeting of the MTP in my region. I understand that regular attendance is required.

\* \* \*

15. I understand that the *MTP shall notify each of the people set out in paragraphs 24 and 26 below that I have authorized information to be released to them and shall notify them again if my consent to release information is revoked or otherwise limited.*

\* \* \*

*CONSENT TO RELEASE OF INFORMATION*

22. *Federal Law.* I acknowledge that I have been given a copy of the notice entitled Confidentiality of Alcohol & Drug Abuse Patient Records, that I have read this notice and that I understand its contents. I have been given an opportunity to ask questions about this notice. I understand that I may ask further questions about this notice and the federal law which governs the confidentiality of alcohol and drug abuse patient records and that MTP will answer my questions at any time.

\* \* \*

24. *Release to and from Key People in My Life.* I further authorize the MTP to release information from my MTP records to the following people and authorize these listed people to release information to the MTP:

My personal physician: *Dr. Brash[a]r*

Doctors with whom I associate: *Dr. Marchand & Benz[el].*

\* \* \*

28. *Contract Term.* .... IN THE EVENT I REVOKE MY CONSENT(S) SET FORTH IN PARAGRAPHS 24 AND 26 ABOVE, OR OTHERWISE LIMIT THE MTP'S RIGHT TO DISCLOSE INFORMATION TO THE PEOPLE IDENTIFIED IN THOSE PARAGRAPHS, *THE MTP SHALL NOTIFY THOSE PEOPLE THAT I HAVE REVOKED MY CONSENT(S).*

{10} Duran complied with the terms of the Agreement for a month or so, but then his level of compliance dropped significantly. In particular, Duran attended Program meetings on January 31, 1995, and February, 7, 14, and 21, 1995, but missed Program meetings on February 28 and March 7, 1995. Duran also missed an appointment with Brashar on March 6, 1995. Duran informed Marchal and Benzel that he refused to attend the meetings because he does not subscribe to theistic religion or spiritual beliefs and he objected to the highly religious content present in both the Program meetings and the Alcoholics Anonymous meetings. Marchal and Benzel dismissed Duran's objections as evidence of his denial of addiction.

{11} In February 1995, Dr. Anson, a faculty member at the Medical School, told Benzel that he considered Duran's behavior to be both irresponsible and erratic. Duran's behavior caused Anson to question Duran's surgical abilities and trustworthiness. As a result of his concerns, Anson informed Benzel that he did not want Duran to participate in his elective cases.

{12} In March 1995, Duran and Marchal discussed Duran's failure to comply with the terms of the Agreement. In the course of their discussion, Marchal became confrontational and told Duran that he had to attend the Program meetings. Duran refused to heed Marchal's demand, telling Marchal that he was terminating the voluntary contract.

{13} After the discussion, Marchal informed Benzel that Duran had terminated his voluntary agreement to attend the Program. Benzel then contacted Duran and told him that his failure to attend the Program "was unacceptable and demanded that [Du-

ran] contact Marchal to continue the meetings." Duran honored Benzel's demand and contacted Marchal.

{14} In response to Duran's telephone call, Marchal set up a mid-March meeting with Duran, Benzel, and several other members of the Medical School's faculty. At the meeting, Duran's perceived substance-abuse problems were addressed. A treatment plan was formulated to address Duran's problems. On March 17, 1995, Marchal mailed a letter to Benzel summarizing the treatment plan formulated at the meeting. Marchal noted in the letter that:

> ANY POSITIVE URINE SCREEN OR ABSENCE AT MTP OR LOVELACE WILL BE CONSIDERED A VIOLATION OF THE SECOND AND LAST CHANCE GIVEN TO DR. DURAN on Tuesday March 14, 1995.

On that same date, Marchal, with Benzel's approval, "told [Duran] that 'any positive urine screen or absence at [the Program] will be considered a violation of the second and last chance given to ... Duran.'" The "second and last chance" referred to above directly pertains to Duran's participation in the Program, not to Duran's employment status at the Hospital.

{15} On June 29, 1995, a second meeting was held to discuss Duran's ongoing failure to comply with the Program's requirements. Duran attended this meeting, as did Marchal, Benzel, and other members of the Medical School's faculty. At the meeting, Duran was accused of various infractions. He was told that, in light of these several infractions, he had to attend the Program meetings on penalty of being fired.

{16} After the meeting, Duran was again told that his attendance at the Program was mandatory. Although Duran does not expressly state that he entered into a contract of employment conditioned on his participation in the Program, the only inference that can be drawn from his statements is that he did. The employment contract, the parties to which were limited to Duran and the University's Regents, was executed by Benzel on June 29, by Duran on June 30, and by Hansbarger on July 1, 1995 (1995 Contract). This contract supplanted the 1994 Contract.

{17} In August 1995, Marchal again became concerned about Duran's ongoing failure to comply with a treatment plan formulated for the purpose of helping him overcome his drug and alcohol problems. As a result of his concern, Marchal sent a letter to Duran, along with a copy of that letter to Benzel, in which he summarized Duran's lack of compliance with the treatment plan. Benzel summoned Duran to meet with him and Hansbarger when he received his copy of the letter. At that meeting, Benzel and Hansbarger gave Duran a letter of immediate dismissal. Under the terms of that letter, Duran's 1995 Contract was terminated effective August 11, 1995. In February, 1997, Duran filed suit.

## DISCUSSION

### I. CIVIL RIGHTS CLAIMS

{18} Duran's first, second, and third causes of action against the Program and Marchal sought relief on the ground that Marchal violated, or conspired with several members of the Medical School's faculty to violate, his civil rights—including his rights to due process, freedom of religion, freedom from unreasonable search and seizure, and privacy. This appeal does not include any such claims against the Medical School faculty, only against the Program and Marchal. The Program and Marchal moved to dismiss these causes of action for failure to state a claim on the ground that neither the Program nor Marchal are state actors and, therefore, cannot be held liable for civil rights violations under the statutory and constitutional provisions set forth in Duran's complaint. The trial court granted the Program and Marchal's motion to dismiss on the ground that even after accepting as true all of the factual averments set forth in his complaint, Duran could not prove that the Program and Marchal's actions amounted to the requisite state action.

#### A. *Standard of Review*

{19} A motion to dismiss for failure to state a claim should not be granted unless "it appears that plaintiff cannot recover, or be entitled to relief, under any state of

facts provable under the complaint." *Noriega v. Stahmann Farms, Inc.*, 113 N.M. 441, 442, 827 P.2d 156, 157 (Ct.App.1992). Although the factual allegations of the complaint are assumed to be true on a Rule 1–012(B)(6) NMRA 1999 motion, conclusions of law are not admitted. *See C & H Constr. & Paving, Inc. v. Foundation Reserve Ins. Co.*, 85 N.M. 374, 376, 512 P.2d 947, 949 (1973). This is so because the very purpose of a motion to dismiss is to "test the legal sufficiency of the claim." *Garner v. Department of Corrections*, 120 N.M. 547, 548, 903 P.2d 858, 859 (Ct.App.1995).

**B.** *No State Action*

■ {20} In this appeal, Duran concedes the Program and Marchal cannot be held liable for the civil rights violations set forth in his complaint unless their actions can be characterized as state action. In addressing Duran's civil rights claims, we must focus on the Program and Marchal's actions because, as Duran admits, neither one is a state employee. This fact notwithstanding, Duran maintains he is entitled to relief because the Program and Marchal assumed the role of state actors by jointly participating with the state and its employees in his contractual relationship with the Hospital and by accepting state-delegated power to determine whether his contractual relationship with the Hospital would endure.

■ {21} The general rule is that constitutional guarantees of individual liberty apply to the actions undertaken by the state (a person acting under color of state law, *see* 42 U.S.C. § 1983), and not to the actions undertaken by private persons and entities. *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 619, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *see also LaBalbo v. Hymes*, 115 N.M. 314, 319, 850 P.2d 1017, 1022 (Ct.App.1993). In special circumstances, however, a private party's actions can be characterized as state action. For example, under the "public function" doctrine, if a private entity is entrusted by the state to perform functions that are traditionally viewed as governmental in nature, the private entity becomes an agent of the state, and its actions constitute state action. *See*

*Lintz v. Skipski*, 807 F.Supp. 1299, 1305 (W.D.Mich.1992).

{22} In the case at bar, Duran relies on our decision in *LaBalbo*, which is also a "public function" case, to support his assertion that the Program and Marchal are state actors for the purposes of his alleged civil rights violations. In *LaBalbo*, a private home for disabled persons discharged one of its patients without due process. *See id.* at 319–20, 850 P.2d at 1022–23. This Court held the home to be a state actor because the State of New Mexico had delegated the authority to discharge patients to the home. *See id.* at 319, 850 P.2d at 1022. We based our holding on the well-settled rule that a private party may be characterized as a state actor for the purposes of constitutional analysis if the private party jointly participated with the state in depriving a person of his constitutional rights. *See id.*

{23} Duran claims that, as in *LaBalbo*, the State of New Mexico, through the Medical School, delegated "certain responsibilities with regard to drug and alcohol testing to the [Program] and [ ] Marchal concerning Duran, requiring Duran to do as ordered by the [Program] on peril of Duran being terminated from his position at the University of New Mexico." Although Duran's factual allegations are not unfounded, the legal conclusion he attempts to draw from them is Duran's error stems from the fact that he misapprehends and thus overstates the role the Program and Marchal played in his contractual relationship with the Hospital.

{24} In order to make this point, we note the duties and responsibilities delegated and not delegated to the Program by the Hospital. The Hospital did put the Program in charge of overseeing Duran's substance-abuse counseling. The Hospital did condition Duran's employment status on his compliance with the requirements of the Program as set forth in the Agreement. The Hospital did not, however, give the Program any authority to fire Duran. This last observation is critical because it distinguishes the case at bar from *LaBalbo* and the other cases cited in Duran's briefs. *Compare NCAA v. Tarkanian*, 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (finding no

state action where "the final act challenged by Tarkanian—his suspension—was committed by UNLV") *with LaBalbo,* 115 N.M. at 319, 850 P.2d at 1022 (finding state action where a rest home had the ultimate authority to discharge a patient in the facility) *and Tomai–Minogue v. State Farm Mut. Auto. Ins. Co.,* 770 F.2d 1228, 1232 n. 4 (4th Cir. 1985) (finding state action where state statute gave judgment creditors the right to cause judgment debtor's driver's licence to be suspended upon filing unsatisfied judgment with the state Department of Motor Vehicles). In view of the facts that the Hospital delegated no power to the Program or Marchal to discharge Duran and neither the Program nor Marchal actually participated in firing him, we conclude that their actions cannot be characterized as state action. The trial court properly dismissed Duran's civil rights causes of action for failure to state a claim.

## II. INTERFERENCE WITH CONTRACTUAL RELATIONS

{25} Duran's fourth cause of action against the Program and Marchal sought relief on the ground that Marchal interfered in his contractual relationship with the Hospital. Duran claimed Marchal caused the Hospital to fire him as chief resident in the Medical School's neurosurgery division by informing Benzel that he had not only revoked the Agreement, but that he had also failed to fully comply with the terms of the Agreement and the Program's requirements. According to Duran, Marchal acted improperly because Duran revoked the Agreement prior to Marchal's disclosures and thereby revoked the consent releases contained in the Agreement that had allowed Marchal to disclose to the Hospital what otherwise would have been confidential information. Duran thus argued that Marchal disclosed privileged information to the Hospital, information that he claims played a substantial role in the Hospital's decision to terminate his employment contract.

{26} The Program and Marchal responded to Duran's fourth cause of action by filing a motion for summary judgment. In their motion, the Program and Marchal claimed they were entitled to judgment as a matter of law because (1) Duran could not prove that Marchal had improper motives or employed improper means when he disclosed Duran's failure to honor or abide by the Agreement, (2) Duran could not demonstrate that his employment contract would have been performed by the Hospital if not for Marchal's actions, and (3) Marchal did not do anything outside the purview of the Agreement or Duran's 1995 Contract.

{27} The trial court granted the Program and Marchal's motion for summary judgment. The trial court did not, however, specifically identify the ground or grounds upon which it was awarding the motion. For the reasons set forth below, we affirm the trial court's decision on the ground that the Program and Marchal were entitled to judgment as a matter of law because any act of interference attributable to the Program or Marchal can be justified by the Agreement and Duran's 1995 Contract.

### A. *Standard of Review*

{28} We can affirm the trial court's order awarding summary judgment only if the record reveals no triable issues of material fact and the moving parties are entitled to judgment as a matter of law. *See Gardner–Zemke Co. v. State,* 109 N.M. 729, 732, 790 P.2d 1010, 1013 (1990). On appeal, we must view the pleadings, affidavits, and depositions presented for and against a motion for summary judgment in a light most favorable to the nonmoving party. *See id.* Summary judgment is foreclosed when the record discloses the existence of a genuine controversy concerning a material issue of fact. *See id.* The presence of a material issue of fact cannot be based on speculation. *See Cordova v. City of Albuquerque,* 86 N.M. 697, 703, 526 P.2d 1290, 1296 (Ct.App.1974).

### B. *No Improper Interference*

{29} In order for Duran to recover damages on his fourth cause of action, he has to prove that the Program and Marchal improperly induced the Hospital not to perform its employment contract with Duran. *See Wolf v. Perry,* 65 N.M. 457, 461, 339 P.2d 679, 681 (1959). The issue we must resolve is

whether the alleged interference was improper, because if the act of interference can be justified, " 'it is not actionable, even though damage may result therefrom.' " *Williams v. Ashcraft*, 72 N.M. 120, 122, 381 P.2d 55, 56 (1963) (quoting 30 Am.Jur. *Interference*, § 47); *see also M & M Rental Tools, Inc. v. Milchem, Inc.*, 94 N.M. 449, 454, 612 P.2d 241, 246 (Ct.App.1980) (stating that without an improper motive or improper means, an interference is privileged).

{30} Duran claims the Program and Marchal interfered in his contractual relationship with the Hospital because Marchal disclosed confidential information to Benzel on at least two occasions—March 10, 1995, and August 11, 1995, respectively. According to Duran, Marchal disclosed this information for the purpose of coercing him to attend Program meetings and to force him to pay for attending those meetings. Duran intimates that Marchal's acts of disclosure were improper because they were motivated by anger and want for pecuniary gain.

{31} Before addressing the substance of Duran's claim, we first observe that it is unclear whether Duran seeks relief under the 1994 Contract, the 1995 Contract, or both. The first disclosure was made in March 1995, when the 1994 Contract was still operative. Duran can only seek relief for this disclosure under the 1994 Contract. *See Beck v. American Health Group, Int'l. Inc.*, 211 Cal.App.3d 1555, 260 Cal.Rptr. 237, 245 (1989) (ruling the existence of contract is an element of tort); *Wolf*, 65 N.M. at 462, 339 P.2d at 681 (ruling that even if improper conduct could be shown, tort for inducement for breach of contract could not be proved because no contract was yet in existence). The second disclosure, meanwhile, was made in August 1995, after the 1994 Contract had been supplanted by the 1995 Contract. Duran can only seek relief for this disclosure under the 1995 Contract. *See Beck*, 260 Cal.Rptr. at 245 (Johnson, J., concurring); *Shriners Hosp. for Crippled Children v. Kirby Cattle Co.*, 89 N.M. 169, 171, 548 P.2d 449, 451 (1976) (ruling that in the absence of a contract, there can be no cause of action in tort for interference with contractual relations). In view of the uncertainty surrounding this issue, we assume Duran intended to sue under both contracts and hold that he is not entitled to relief under either contract.

### 1. *1994 Contract*

{32} Duran claims Marchal first interfered with his contractual relationship with the Hospital in March 1995, when he informed Benzel that Duran had revoked the Agreement. As stated above, Duran contends Marchal disclosed this information for the improper purpose of coercing him to attend Program meetings. Whether Duran's assertion is well-grounded is inconsequential, because the Program and Marchal were justified in disclosing this information to the Hospital under the terms of the Agreement.

{33} According to the Agreement, the Program was contractually obligated to notify Benzel that Duran had revoked the Agreement when Duran informed Marchal that he no longer intended to participate in the Program. Duran concedes that if Marchal had not informed Benzel about Duran's desire to withdraw from the Program, Marchal would have breached the Program's duty to notify under the terms of the Agreement. We hold that the Program's duty to notify undermines Duran's argument that Marchal improperly disclosed his revocation of the Agreement. *See Bank of N.M. v. Sholer*, 102 N.M. 348, 350, 695 P.2d 832, 834 (Ct.App.1985) (ruling that no liability could attach under contract interference claim where defendant had contractual right to engage in challenged conduct). Finally, there is no allegation of any breach of the 1994 Contract.

### 2. *1995 Contract*

{34} Duran claims Marchal next interfered with his contractual relationship with the Hospital in August 1995, when Marchal gave Benzel a letter summarizing Duran's lack of compliance with the treatment plan formulated at their March 1995 meeting. Duran again asserts that he revoked the Agreement, along with its consent releases, in March 1995. He intimates that even if the Program and Marchal had a contractual duty to inform the Hospital in March 1995 that Duran revoked the Agreement, the Program and Marchal did not have a similar duty in

August 1995 because the Agreement no longer existed. The gist of Duran's argument is that, unlike the case in the 1994 Contract, the Program and Marchal cannot justify the Program and Marchal's disclosures to the Hospital by relying on a voluntary consent release and Marchal's prior contractual obligation to disclose. We disagree.

{35} Even if we accept as true Duran's factual averment that he revoked the Agreement in March 1995, the Program and Marchal still had reason to contact the Hospital in August 1995 to report Duran's failure to complete the Program's requirements. In June 1995, at a meeting held for the purpose of discussing Duran's ongoing failure to comply with the requirements of the Program, Duran was told that he had to attend the Program meetings on penalty of being fired. After the meeting, Duran was again told that his attendance at the Program was mandatory. Duran immediately thereafter entered into the 1995 Contract.

{36} In light of the foregoing, we hold that the Program and Marchal cannot be held liable for interfering with Duran's 1995 Contract because Duran's employment status was conditioned on his participation in the Program. Although the 1995 Agreement does not expressly condition Duran's employment status on his participation in the Program, this condition was necessarily implied. The 1995 Contract could not be honored—indeed it would cease to make sense—if Duran's employment status was contingent upon his successful participation in the Program, but the Program lacked the authority to disclose to the Hospital Duran's progress in the Program. *See Sholer*, 102 N.M. at 350, 695 P.2d at 834 (ruling that no liability could attach under contract interference claim where defendant had contractual right to engage in challenged conduct); *Clough v. Adventist Health Sys., Inc.*, 108 N.M. 801, 806, 780 P.2d 627, 632 (1989) (summary judgment proper where defendant had legitimate business purpose for allegedly improper actions). We hold that the Program and Marchal did not improperly interfere in Duran's contractual relationship with the Hospital under the 1995 Contract because their communications with the Hospital were both foreseen and implied in the 1995 Contract and were therefore privileged.

**CONCLUSION**

{37} For the reasons stated, we affirm.

{38} **IT IS SO ORDERED.**

BOSSON and ARMIJO, JJ., concur.