2008-NMSC-024

183 P.3d 905

**Carl CASE, Petitioner,**

v.

**Timothy HATCH, Warden of the Guadalupe County Correctional Facility, Respondent.**

**No. 29,786.**

Supreme Court of New Mexico.

April 15, 2008.

Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, L.L.P., Peter Shoenburg, Marc M. Lowry, Albuquerque, NM, for Petitioner.

Gary K. King, Attorney General, Steven S. Suttle, Assistant Attorney General, Santa Fe, NM, for Respondent.

**OPINION**

CHÁVEZ, Chief Justice.

{1} On January 30, 1982, the moderately to severely decomposed body of a teenage girl, Nancy Mitchell, was discovered in Eddy County near an area known locally as Six Mile Dam. Petitioner Carl Case was convicted by a jury on October 26, 1982 of first-degree murder and first-degree criminal sexual penetration of Mitchell. The evidence in support of his conviction included the eyewitness testimony of three teenaged witnesses, Audrey Knight, Paul Dunlap, and Bobby Autry, which, while not entirely consistent, incriminated Case. Case also testified at his trial and (1) admitted he was present during the events that led to the victim's death; (2) corroborated the presence of Knight and Dunlap at the scene, but testified that Mitchell accidentally fell. This Court affirmed his conviction in *State v. Case*, 100 N.M. 714, 676 P.2d 241 (1984).

{2} On December 4, 2003, over twenty years after Case's conviction, Knight and Dunlap signed affidavits recanting their trial testimony that had incriminated Case, asserting that they did not know anything about the events leading to Mitchell's death. Knight and Dunlap originally made these assertions to the police, and they were the subject of extensive cross-examination during the trial. Each of the three witnesses testified at trial under oath that their original statements to the police, denying any knowledge of the crime, were false and were made

because of threats of violence from Case and others. Knight now asserts that she perjured herself at trial because of the intense pressure she felt from law enforcement. Dunlap now asserts that he perjured himself at trial because of the intense pressure he felt while incarcerated pending charges for Mitchell's rape and murder.

{3} In 2004, Case filed a verified petition for a writ of habeas corpus in state district court. In his petition Case asserted that the newly-discovered recantations by two of the three eyewitnesses violated his fundamental right to a fair trial under the due process clauses of the federal and state constitutions, and more specifically, that "the prosecution purposefully withheld knowledge that the witnesses were fabricating their testimony from the defense." The State responded to the petition, arguing that (1) the recantations were not credible; (2) the witnesses' original statements were the subject of extensive cross-examination by defense counsel; and (3) Case failed to prove that the testimony at trial was knowingly and intentionally used by the prosecution. In reply, Case asserted that he was not contending that the prosecution deliberately falsified the testimony, just that the witnesses "were young, inexperienced, and impressionable ... who chose to accommodate the prosecution's view of events rather than challenging" the aggressive techniques of the prosecution team.

{4} During the pendency of the habeas corpus proceedings, counsel for Case discovered four taped statements made by Autry to law enforcement of Autry's version of the events that occurred on New Year's Day. Autry is the only witness who has not recanted his testimony. Case's counsel asserted that one of the four statements was not produced by the prosecution, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Following evidentiary hearings in November 2005 and February 2006, the district court denied the petition, finding that:

1) The State did not illegally suppress evidence that was materially favorable to [Case].

2) The State did not knowingly or recklessly use false testimony at [Case's] trial.

3) The recantations of Paul Dunlap and Audrey Knight do not constitute newly discovered evidence in that assuming arguendo, that their original testimony was false, [Case] knew it was false when given. [Case's] counsel could not find evidence to prove [Case's] claimed alibi and did not rebut the "false" testimony. [Case] in fact conformed his testimony to match the "false" testimony, took the stand and corroborated much of the "false" testimony with his own testimony.

4) Law Enforcement's interrogation of Paul Dunlap and Audrey Knight do not shock the conscience of the Court and do not constitute impermissible police conduct.

5) The Court does not find a new trial warranted by "cumulative error."

Because we conclude that the trial court did not abuse its discretion in concluding that the recantations did not constitute newly-discovered evidence, and that the prosecution did not suppress material evidence, we affirm the denial of the petition for writ of habeas corpus.

## I. APPROPRIATE ANALYSIS FOR HABEAS RELIEF BASED ON RECANTED TESTIMONY

{5} When a witness recants his or her trial testimony, the recantation may constitute newly-discovered evidence warranting a new trial under Rule 5–614 NMRA. In evaluating the recantation testimony, the court must consider whether:

(1) the original verdict was based upon uncorroborated testimony; (2) the recantation occurred under circumstances free from suspicion of undue influence or pressure from any source; (3) the record fails to disclose any possibility of collusion between the defendant and the witness between the time of the trial and the retraction; and (4) the witness admitted [the] perjury on the witness stand and thereby subjected [himself or] herself to prosecution.

*Montoya v. Ulibarri,* 2007–NMSC–035, ¶ 31, 142 N.M. 89, 163 P.3d 476 (quoted authority omitted) (alterations in original). The grant of a new trial is not automatic; rather, the defendant must prove that the newly-discovered evidence meets each of the following requirements:

> "1) it will probably change the result if a new trial is granted; 2) it must have been discovered since the trial; 3) it could not have been discovered before the trial by the exercise of due diligence; 4) it must be material; 5) it must not be merely cumulative; and 6) it must not be merely impeaching or contradictory."

*State v. Garcia,* 2005–NMSC–038, ¶ 8, 138 N.M. 659, 125 P.3d 638 (quoting *State v. Volpato,* 102 N.M. 383, 384–85, 696 P.2d 471, 472–73 (1985)). However, a motion for a new trial based on newly-discovered evidence must be brought within two years of the date of final judgment. Rule 5–614(C).

{6} When a witness recants testimony more than two years after final judgment, a defendant may still be entitled to relief. It has been held that the only relief available is executive clemency under NMSA 1953, Section 31–21–17 (1955) and Article V, Section 6 of the New Mexico Constitution. *See State v. Minns,* 81 N.M. 428, 429, 467 P.2d 1000, 1001 (Ct.App.1970). However, executive clemency as an exclusive remedy has been called into question by at least two of this Court's opinions where recanted testimony was at issue. This Court recently recognized that a free-standing claim of actual innocence entitled a defendant to habeas corpus relief under Rule 5–802 NMRA, if the petitioner proved "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Montoya,* 2007–NMSC–035, ¶ 30, 142 N.M. 89, 163 P.3d 476. We also held in 1963 that a defendant could seek relief under Rule 5–802 when a "deprivation of constitutional rights amounts to a denial of due process." *Johnson v. Cox,* 72 N.M. 55, 57, 380 P.2d 199, 201 (1963). The latter relief is available because the "right to substantive due process embodies principles of fundamental fairness and entitles every individual to be free from arbitrary or oppressive government conduct."

*State v. Vallejos,* 1997–NMSC–040, ¶ 31, 123 N.M. 739, 945 P.2d 957. In determining whether that right has been violated, "the inquiry on habeas corpus is directed to a review of the entire proceedings, and if the total result was the granting to [the] accused of a fair and deliberate trial, then no constitutional right has been invaded, and the proceedings will not be disturbed." *Johnson,* 72 N.M. at 57, 380 P.2d at 201.

■ {7} In reviewing a writ of habeas corpus based on recanted testimony, we must distinguish between a "knowing prosecutorial use of perjured testimony," *Sanders v. Sullivan,* 863 F.2d 218, 221 (2nd Cir.1988), and a "mere repudiation of former testimony or admission of perjury." *Johnson,* 72 N.M. at 58, 380 P.2d at 201 (being convinced after reviewing all of the proceedings that the recanting witness did not commit perjury at trial *or,* in any event, that perjured testimony was wilfully and intentionally used by the prosecution).

■ {8} The knowing prosecutorial use of perjured testimony clearly implicates the necessary state action for a violation of due process. *Mooney v. Holohan,* 294 U.S. 103, 112–13, 55 S.Ct. 340, 79 L.Ed. 791 (1935) ("[T]he action of prosecuting officers on behalf of the state . . . may constitute state action within the purview of the Fourteenth Amendment."); *see also Duran v. N.M. Monitored Treatment Program,* 2000–NMCA–023, ¶ 21, 128 N.M. 659, 996 P.2d 922 (citing *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 619, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991)) (recognizing the requirement for state action in due process claims). When the petitioner alleges that the prosecution deliberately participated in the falsification, we require the petitioner to show: (1) that the original testimony was, in fact, false; and (2) "that it was knowingly, wilfully and intentionally used by the prosecution to procure the conviction." *Johnson,* 72 N.M. at 58, 380 P.2d at 201. The same test applies when the prosecution does not actually solicit false testimony, but instead learns it is false during the course of the trial and " 'allows it to go uncorrected when it appears.' " *State v. Hogervorst,* 87 N.M. 458, 459, 535 P.2d 1084, 1085 (Ct.App.1975) (quoting *Napue v.*

*Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).

■ {9} Case is not making a free-standing claim of actual innocence. We also do not interpret his petition as contending that the prosecution deliberately participated in the presentation of false testimony. Case initially contended in his petition that "the prosecution purposefully withheld knowledge that the witnesses were fabricating their testimony from the defense." However, in his reply he specifically cited *Johnson* indicating he was not contending that the prosecution deliberately falsified the testimony. In any event, we agree with the trial court finding that the State did not knowingly or recklessly use false testimony at Case's trial.

{10} The issue of whether a petitioner is entitled to habeas corpus relief when the petitioner raises due process implications from the alleged unknowing use of perjured testimony by the prosecution is unsettled. The United States Supreme Court has not addressed the issue. *Evenstad v. Carlson,* 470 F.3d 777, 783 (8th Cir.2006). In *Durley v. Mayo,* however, four Justices would have held that "[d]eprivation of a [habeas corpus] hearing under these circumstances amounts . . . to a denial of due process of law." 351 U.S. 277, 291, 76 S.Ct. 806, 100 L.Ed. 1178 (1956) (Douglas, J., dissenting). The majority never reached the question, instead dismissing for lack of jurisdiction. *Id.* at 285, 76 S.Ct. at 806 (majority opinion). More recently, Justices Stevens and Ginsburg made the same argument in their opposition to a denial of certiorari. *Jacobs v. Scott,* 513 U.S. 1067, 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995) (Stevens & Ginsburg, JJ., dissenting).

{11} A majority of the federal circuit courts require a knowing use of perjured testimony by the prosecution to find a violation of due process. *Sanders,* 863 F.2d at 222 (citing cases from the Third, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuit Courts of Appeals). The Second Circuit in *Sanders* found that due process rights may be implicated "when a credible recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in place." *Id.* (footnote omitted). In New Mexico, we have expressed a "particular interest in ensuring accuracy in criminal convictions in order to maintain credibility within the judiciary." *Montoya,* 2007–NMSC–035, ¶ 21, 142 N.M. 89, 163 P.3d 476. As such, we are loath to deny a petitioner any chance at relief when it is proven that he or she remains incarcerated solely on the basis of lies. To do so would make truth subordinate to process and undermine the "[f]undamental fairness [that] is intrinsic within the concept of due process that is provided by the New Mexico Constitution." *Montoya,* 2007–NMSC–035, ¶ 23, 142 N.M. 89, 163 P.3d 476; *see also Sanders,* 863 F.2d at 224.

{12} That leaves us with the question of the appropriate analysis required to grant or deny habeas corpus relief. Aside from the passage of time, we see little difference between a motion for new trial and a petition for writ of habeas corpus based on the newly-discovered evidence of a recantation. *Cf. United States v. Duke,* 50 F.3d 571, 576 (8th Cir.1995) ("We apply the same standards of review in a § 2255 proceeding as in a habeas corpus proceeding.") (citation omitted). In a motion for a new trial, we evaluate the credibility of the recantation under the four factors described in *Montoya* and the significance of the new evidence to the verdict under the six factors described in *Garcia.* Both the credibility of the recantation and the significance of the evidence are also important in a habeas corpus proceeding.

{13} We cannot, however, ignore the dimension of time. A motion for new trial must necessarily be brought within a relatively short time after the original trial. This minimizes the risk that witnesses will disappear, evidence will be lost, and memories will fade. *See Barker v. Wingo,* 407 U.S. 514, 521, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ("As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade."). The new trial following a timely motion for new trial should proceed very similarly to the original trial, with the exception of the new evidence. As a result, the trial court can look ahead to the probable

outcome of a new trial in order to gauge the significance of the new evidence.

{14} In contrast, a habeas corpus petition can be brought many years—or even decades—after the original trial. This remoteness practically guarantees missing witnesses, lost evidence, or faded memories. A new trial at this late date would most likely take a very different course than the original trial, even without the new evidence. The probable outcome of a new trial therefore says little, if anything, about the significance of the new evidence: We cannot "look into the seeds of time/And say which grain will grow and which will not." William Shakespeare, *Macbeth*, Act 1, scene 3.

{15} To insure that the analysis is made with the freshest possible evidence, we replace the first factor of *Garcia* with a rearward look at the original trial. Looking at the record as a whole, including both the original and the new evidence, the reviewing court must determine whether it is left "with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *See Sanders*, 863 F.2d at 226 (footnote omitted). We recognize that most circuits in this situation, and our own Rule 5–614, would grant a new trial if the petitioner can show that "the jury would have 'probably' or 'likely' reached a different verdict had the perjury not occurred." *Evenstad*, 470 F.3d at 783 n. 6. We believe, however, that the "firm belief" standard requires more and will avoid new trials when the perjured testimony is of an extraordinary nature. *See Sanders*, 863 F.2d at 226.

{16} In *Montoya*, we listed four factors that must be considered when evaluating whether the recantation is credible, that is, whether the trial testimony was perjured. *Id.*, 2007–NMSC–035, ¶ 31, 142 N.M. 89, 163 P.3d 476. One additional factor that must be considered is whether the new testimony is corroborated by additional new evidence. This is not a new factor, but one that we have considered in the past. In *State v. Chavez*, 87 N.M. 38, 528 P.2d 897 (Ct.App. 1974), the Court of Appeals granted a new trial after a key prosecution witness recanted and another person confessed to the crime. We noted later, in *State v. Stephens*, 99 N.M.

32, 37, 653 P.2d 863, 868 (1982), that the confession in *Chavez* was persuasive in part because it was corroborated by other eyewitnesses.

{17} In summary, a petitioner seeking a new trial through a writ of habeas corpus because of recanted testimony must prove, based upon the entire record, including the original trial proceedings at issue, that the recantation is credible and was significant to the original verdict. In assessing the recantation's credibility, the trial court, in addition to weighing the credibility of the witnesses, must consider the following factors, none of which is dispositive by itself:

(1) the original verdict was based upon uncorroborated testimony; (2) the recantation is corroborated by additional new evidence; (3) the recantation occurred under circumstances free from suspicion of undue influence or pressure from any source; (4) the record fails to disclose any possibility of collusion between the defendant and the witness between the time of the trial and the retraction; and (5) the witness admitted the perjury on the witness stand and thereby subjected himself or herself to prosecution.

To show that a credible recantation was significant, the petitioner must prove that the evidence meets each of the following requirements:

(1) it must have been discovered since the trial; (2) it could not have been discovered before the trial by the exercise of due diligence; (3) it must be material; (4) it must not be merely cumulative; (5) it must not be merely impeaching or contradictory; and (6) the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

With the exception of the "firm belief" standard which we announce today, the remaining factors are already a part of New Mexico habeas corpus jurisprudence. On appeal we will review the district court's determination for an abuse of discretion. *State v. Sena*, 105 N.M. 686, 687, 736 P.2d 491, 492 (1987).

## II. SUMMARY OF HABEAS TESTIMONY AND TRIAL EVIDENCE

{18} We begin the analysis with a summary of the testimony at the habeas hearing and a summary of the trial testimony we consider important to a determination of whether the trial court abused its discretion in denying the petition.

### A. KNIGHT'S TESTIMONY

{19} During the habeas hearing, Knight testified in response to questions by the judge that she had lied at trial, she was never at the scene, and she did not know anything about the events leading to Mitchell's death. She explained that during her initial visits with the police, she told them that she did not know anything about the events leading to Mitchell's death. However, she claims she felt pressured because the police interviewed her a number of times and told her they had information that her truck was at the scene. Finally, when Case changed his story and admitted that he was at the scene, she changed her story and gave the police details of what happened, with one lie leading to another.

{20} During the trial, over twenty years before the habeas evidentiary hearing, Knight testified to the following. She was seventeen years old at the time and considered Mitchell a friend. She saw Mitchell at a party on the island near Six Mile Dam. Mitchell was with Case, Curtis Worley, Mike Tweedy, Joe Brown, and Dunlap in a car driven by Worley. The boys were talking about what a nice body Mitchell had and how they wanted to have sex with her. Knight did not believe that Mitchell heard the discussion, but the boys talked about gang-banging Mitchell and something about the dam. Knight then saw Mitchell get in a car with the boys and leave the party. About fifteen minutes later, Knight drove in her truck to the dam, where she saw Worley's car parked. She stopped her truck and started to get out, when Case and then Dunlap approached her and told her she should not be there. Knight did not leave immediately because she saw Mitchell in the car with her shirt off and Worley on top of her. Mitchell saw Knight and hollered "Help, Audrey." Knight started toward the car, but Case and Dunlap got in front of her and pushed her. She then saw Worley hit Mitchell and saw Tweedy hold Mitchell's hands and then cover her mouth. At that point, Knight left.

{21} When asked why she had not told the police what she saw, Knight testified that Case and Dunlap had told her not to say anything or they would hurt her family and a specific friend. She said she was afraid of them. She also described a conversation the next day where the boys, including Case, expressed concern about Mitchell's body being found.

{22} During an extensive cross-examination, Knight acknowledged that when she first spoke with the police, she lied and was trying not to tell the police anything about the boys. Having admitted that she lied to the police, she claimed that she lied because she was scared. She also acknowledged under cross-examination that she felt pressure from the police and was a little afraid of them. She indicated that the police were the first ones to use the phrase "gang bang." She was not able to verify that Autry was there that night, although she had previously told the police that he might have been.

### B. DUNLAP'S TESTIMONY

{23} During the habeas hearing, Dunlap testified that while he was in custody, he initially told the police that he did not have any knowledge about the events leading to Mitchell's death. He was then given a polygraph test and was told by the police that he failed the test. He was jailed for six months with charges pending against him for Mitchell's rape and murder. Despite having told the police that he did not know anything about the events, he decided he needed to make a deal because other witnesses were lying. He scripted his testimony from untruthful testimony he heard at his bail hearing and from the police questioning. Once he memorized the script, he destroyed it and notified the district attorney that he would take an offer of immunity in return for his testimony. Prior to the murder trial, he spoke with the prosecutor for a few minutes, and at trial told the story he had prepared in

jail. During the habeas hearing, Dunlap conceded on cross-examination that he never told any of the police, the prosecutors, or his lawyer that he was lying at trial, nor was he ever told to lie. However, he testified that all of his testimony implicating Case was untruthful.

{24} During the murder trial, Dunlap testified that he had been granted immunity from prosecution for Mitchell's rape and murder after serving six months in a juvenile detention center. He said that he had initially given a false statement to the police on March 10, 1982. When asked to tell the jury the truth about what happened on January 1, 1982, he stated that he had been at a party near Six Mile Dam and he had gotten a ride in a car driven by Worley. Others in the car included Brown, Autry, Case, Worley, and Mitchell. They drove for a while, then Worley stopped the car and all of the boys got out. When Dunlap started to get back in the car, Worley pulled Mitchell out of the car and hit her in the face, knocking her down. Brown and Case were then holding her on the ground trying to get her shirt off. At that time Dunlap said that lights started to come up the road, so he walked toward the lights. Knight got out of her truck and started to walk toward the people near the car. Dunlap told her to leave because she should not be there. While he was talking to Knight, Mitchell was screaming, but he did not hear her call out for Knight. Case then approached Knight, and after talking with her, Knight left. Dunlap returned to the car, and by then the boys had gotten Mitchell back in the car. When Case returned to the car, he told Dunlap that he had better keep his mouth shut. Brown and Worley then got Mitchell out of the car, put her on the ground, and took off the rest of her clothes. After Brown and Worley got her pants off, Worley pulled his pants off, and Worley, Case, and Brown took turns rolling around on the ground with her. They next put her clothes back on her, and Worley and Case carried her off by the arms, with Joe following them. They were gone for about fifteen minutes, and when they returned without Mitchell, the boys drove back into town with Dunlap. Dunlap was not sure where Autry went when all of this started, but he did not see Autry again. Dunlap also testified that he did not tell anyone what had happened because he was too scared and because Case had threatened him.

{25} During cross-examination at the habeas hearing, Dunlap recounted how he had first been questioned by the police for about twelve hours with them getting angry, getting right up in his face, calling him a liar, and threatening him with a murder charge. The officers did not, however, tell him what the other witnesses were saying. Throughout the statement, he told the police he was not at the party on January 1, 1982, but he admitted that he lied to the police. Dunlap also acknowledged that he had heard testimony from Autry and Knight at his transfer hearing on April 12, 1982, months before he decided to give the police the statement that gave him immunity. He also denied seeing Case or anyone other than Worley strike Mitchell, and he said that he did not see anyone strike her with an object.

## C. AUTRY'S TESTIMONY[1]

{26} Autry was the third eyewitness at trial. Dunlap testified that Autry was present at the party on January 1, 1982, but Knight testified that Autry was not there. Autry testified that he was not at a party on January 1, 1982, but that Worley picked him up at a Dairy Queen. With Worley were Case, Brown, Tweedy, Dunlap, and Mitchell. They drove around for a while and then went to Six Mile Dam. While they were there, Worley reached out to pinch Mitchell on the breast and she slapped him, so he hit her and knocked her down to the ground. Autry testified that when she tried to get back up, Case pushed her down once. He thought that Brown appeared to have something like a stick or a piece of pipe, and he said that Brown hit her with it. While she was on the ground, Autry saw Worley grab Mitchell's pants and rip them open, and the other boys all jumped down on her like a bunch of vultures, holding her down and trying to tear her clothes off. He ran home once he saw what was happening.

1. Autry did not testify during the habeas hearing.

{27} After that day, Autry testified that he received a number of threatening calls from Worley and Case. When the police first interviewed him he did not tell them what had happened, because he said that he and his family had been threatened. He told the police that he was not present when Mitchell was attacked, but he failed a lie detector test when he claimed he did not know what happened to her. After the test, Autry decided to tell the police what happened that night. Autry testified that he did not see either Knight or a truck during the events he witnessed. During cross-examination, he stated that he did not see anyone have sexual intercourse with Mitchell. Autry also acknowledged that he had initially been charged with Mitchell's rape and murder, but he was told that if he testified to what he knew, he would go home.

## D. CASE'S TESTIMONY

{28} Case testified at the habeas hearing that he too had perjured himself at trial based on what he heard at trial. He said that he met with his attorney three days before his trial, and that his attorney told Case that he was unable to find any alibi witnesses for him. Case claimed that he had been to Six Mile Dam with these people in the past, but he had not been there on New Year's Day. During the trial, and not during the meeting three days before trial, Case told his attorney that he was in fact there on New Year's Day. It was not originally part of the trial strategy for him to testify during his trial. Case's attorney testified during the habeas hearing that a few days before trial, he met with his client and advised him that he did not have the witnesses to support his alibi defense. It was during this meeting that Case told his attorney to what he would ultimately testify at trial, and when they agreed that Case would in fact testify during trial.

{29} Turning next to the trial, immediately after the prosecution made their opening statement, Case's attorney told the jury that Case would indeed testify, describing in detail what information Case's testimony would include. Early in his testimony, Case testified about an event at the Sound Castle, a local teenage hangout, when Worley tried to pull Mitchell from Case's car. He said that as a result he had to slap Worley around. Worley left and then returned with a shotgun, threatening to kill Case.

{30} Regarding the events on New Year's Day, he testified that Brown and Worley picked him up at about 10:00 to 10:30. They drove to the Sound Castle, where they picked up Dunlap, and then drove to the Carlsbad Inn, where they picked up Tweedy and Mitchell. They drove for a while and then went to Six Mile Dam. Throughout this time, Worley was constantly pinching Mitchell on the breasts or butt, and she would slap him, but she was pretty much just laughing about it.

{31} When they arrived at Six Mile Dam, everyone except Mitchell got out of the car and went to a platform on the dam. Worley went back to the car, and he and Mitchell were joking when he back-handed Mitchell. Case testified that Mitchell told Worley that she needed to go to the bathroom, but Worley would not let her go. He kept wrestling with her on the hood of the car, trying to pull off her shirt. Worley and Mitchell ended up back in the car, so Case went back to the dam because he "didn't want any part of this." While this was happening, he saw headlights approaching, so he walked back up toward the car from the dam and told Worley to straighten up, it might be the law. Worley had taken Mitchell's top off. Case walked up to see who had arrived. He recognized Knight, and he told her, "Look, stay in your truck and go on back to town." He did not want Knight to see what Worley and Mitchell were doing. Mitchell and Worley stayed in the car for another five to ten minutes. Mitchell was drunk when she got out of the car, and said she still had to go to the bathroom. Halfway down the embankment, she tumbled and rolled the rest of the way to the bottom. Case did not think that the fall was enough to injure anybody. Worley called for her but she did not answer. The boys got back in the car and left her there because Worley did not want to give her a ride back to town. Case testified that he did not see anyone have sexual intercourse with Mitchell that night. Although he

verified the presence of Dunlap and Knight, Case testified that Autry was not there. He also admitted during direct examination that he had lied to the police about the last time he had seen Mitchell and his claim that he hadn't been hanging around Worley and the other boys.

{32} During cross-examination, he acknowledged telling the police that both Worley and Brown were capable of rape and murder. When the police were investigating Mitchell's death, Case told them to look specifically to Worley, but he did not tell the police what he told the jury about her accidental fall, because he did not want to get involved or have his reputation ruined. Case also admitted that when he saw Worley strike Mitchell, he believed Worley intended to have sexual intercourse with her.

### E. FORENSIC PATHOLOGIST'S TESTIMONY

{33} Dr. Greggory Kaufman, a forensic pathologist who performed the autopsy on Mitchell, also testified at trial. He described receiving her body in a state of moderate to severe decomposition. She was wearing a pink t-shirt that was inside-out, a white bra, and red jean-style trousers with the zipper pulled apart. She had multiple contusions or abrasions that were scattered over her head and multiple contusions scattered over her neck and upper front chest. She also had a couple of contusions over the abdomen, and abrasions over her trunk, the backs of her hands, and the top of her feet. The abrasions appeared to have occurred in the period when the body was dying or post-mortem, and their vertical orientation suggested that the body had been dragged along the ground. The bruising he found on Mitchell's body occurred while the patient was alive and would have resulted from a beating, not from a fall. The internal examination revealed a fracture at the base of her skull on the right side, which could have resulted either in her death or just being knocked unconscious. The pathologist couldn't be sure about the injuries to her brain because it had decomposed. There was a small amount of alcohol in her system, probably due to the body's decomposition. He did not find any human

semen during the autopsy and could not prove whether or not somebody had sexual intercourse with her because of the extensive decomposition. In the pathologist's opinion, the cause of death was blunt trauma to the head, and the death occurred approximately three weeks prior to the autopsy, which was performed on January 31, 1982, although that was a "very, very rough estimate" on his part. On cross-examination, he confirmed that he did not see blood in her vaginal wall, he did not test her undergarments for semen, and he did not find any puncture wounds.

### III. WHETHER THE RECANTATIONS WERE NEWLY–DISCOVERED EVIDENCE

{34} In this case, the trial judge assumed that the recantations were credible when he assumed for the sake of argument that the original testimony was false. However, the trial court went on to find that the recantations were not newly-discovered evidence. In support of this finding, the trial court pointed out that (1) Case corroborated much of the false testimony of the witnesses at trial, and (2) Case's attorney was unable to produce evidence to support his alibi. Although we prefer to have the benefit of the trial court's findings regarding each factor relating to the credibility and significance prongs, our Court has not always been so disciplined. *See State v. Smith*, 104 N.M. 329, 333, 721 P.2d 397, 401 (1986), *overruled on other grounds, Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989) (the trial court made findings on each of the six criteria relating to a motion for a new trial, but the Supreme Court only reached the first criterion because it was dispositive). It is likely that the trial court chose not to analyze each factor relating to the credibility prong because a finding that the recantations were not newly-discovered evidence is dispositive. *See State v. Fero*, 107 N.M. 369, 372, 758 P.2d 783, 786 (1988). We agree that a negative finding of any of the six factors under the significance prong is dispositive. This has been the rule in New Mexico since at least 1903. *See Territory v. Claypool*, 11 N.M. 568, 585, 71 P. 463, 468 (1903). However, we believe it would inform our review if trial courts, rather than pre-

suming the credibility of the recantations, would make findings with respect to each factor relating to the credibility prong before addressing the significance prong.

 {35} We next analyze whether the recanted testimony was discovered after the original trial was completed. As is evident from the testimony from the original murder trial, in their initial statements to the police, Knight and Dunlap asserted that they did not know about the events leading to Mitchell's death. These statements appear qualitatively similar to the recantations made during the habeas hearing in that both the initial statements to the police and the testimony at the habeas proceeding failed to incriminate Case in Mitchell's death. However, statements to the police by Knight and Dunlap subsequent to their initial interviews did incriminate Case and were consistent with their trial testimony. The inconsistency in the statements was both alluded to during direct examination and the subject of extensive cross-examination during trial. Thus, the question is whether under these circumstances the recanted testimony constitutes newly-discovered evidence. The burden is on Case to prove that the earlier statements were qualitatively different and thus constitute newly-discovered evidence. Because of the absence of case law in New Mexico on this subject, we have looked to other jurisdictions for guidance.

{36} In *United States v. Earles*, 983 F.Supp. 1236, 1241–43 (N.D.Iowa 1997), a key prosecution witness testified at a grand jury hearing, and then, after failing a polygraph examination, testified differently at a second grand jury hearing. The first testimony supported the defendant; the second supported the State's case. *See id.* The witness then refused to testify at trial, asserting his Fifth Amendment right against self-incrimination. *Id.* at 1243. As a result, both versions of the grand jury testimony were admitted at trial. *Id.* at 1253. The Court considered the second grand jury testimony to be a recantation, and the post-trial testimony that was consistent with the first grand jury testimony to be a "re-recantation." *Id.* at 1245. In his re-recantation, the witness said that his original recantation was

"put together … from hints, suggestions, or coaching by [the prosecutor] and other law enforcement officials," and that he gave false testimony "in the hope of obtaining a reduction of sentence on other charges against him … and because he was told by [the prosecutor] that he was considered a suspect in the [crime] and so he felt he needed to protect himself." *Id.* at 1243–44. Because the defendant knew about both sets of testimony, a later recantation consistent with an earlier one could not be considered newly-discovered evidence. *Id.*

{37} In *Olson v. United States*, 989 F.2d 229, 230 (7th Cir.1993), the petitioner filed a writ of habeas corpus seeking a new trial based on the newly-discovered evidence of two witness recantations. The petitioner had been convicted of murder based in part on the testimony of three witnesses. *Id.* The details revealed by the witnesses at trial were inconsistent, but all of their stories incriminated the petitioner. *Id.* Approximately four or five years after the trial, two of the witnesses recanted. The Court found that the recantations were not newly-discovered evidence because the witnesses had testified inconsistently during two grand jury hearings and one petit jury hearing, and the recantations were merely an attempt "to change their trial stories back to their original grand jury stories." *Id.* at 231. The Court also found the two recantations no more persuasive when considered together, in part because the witnesses did not provide an alibi for the petitioner or identify anyone else as the murderer. *Id.* at 232.

{38} In *United States v. Ramsey*, 761 F.2d 603, 604 (10th Cir.1985), a witness testified that the defendant had hired him to burn down a store. Before the trial, the witness had told the defendant's son that the defendant was innocent. *Id.* Defense counsel cross-examined the witness on this inconsistency. *Id.* After the trial, the witness told two other people that the defendant was innocent and signed an affidavit to that effect. *Id.* The Court held that the recanted recantation was not newly-discovered evidence because "vacillation had been before the jury in the trial." *Id.* The Court also held that any new testimony by the witness

was not credible because the "case is riddled with recantations and reassertions." *Id.*

{39} Similarly, in this case the recantations of Knight and Dunlap are efforts to revert to the original statements they gave to the police that they did not know anything about the events leading to Mitchell's death. Case was aware of these statements, as evidenced by cross-examination of each witness at trial. The defense strategy during the murder trial was that the witnesses were pressured by the police; they were scared of the police; and therefore they conformed their testimony in such a way as to incriminate Case and others. With respect to Dunlap, the defense's additional theory was that Dunlap conformed his testimony to avoid prosecution. The jury heard the evidence and heard arguments of counsel regarding the motives of these witnesses to recant their original statements to the police and perjure themselves during trial. Because the inconsistent statements were the subject of the original trial, a jury has already been charged with the responsibility of weighing the inconsistent statements. As stated by the Court in *Ramsey*, the "vacillation had been before the jury in the trial." *Id.* The jury rejected the defense theory and found Case guilty.

{40} The recantations were also cumulative. *State v. Chavez* is the case in New Mexico most directly on point. 116 N.M. 807, 867 P.2d 1189 (1993). The defendant in that case was initially charged with second-degree murder, among other charges. *Id.* at 809, 867 P.2d at 1191. The defendant's wife, who was a key witness, changed her story twice before trial, and her third story led the State to raise the homicide charge to first-degree murder. *Id.* at 809–10, 867 P.2d at 1191–92. Ten months after he was convicted, the defendant moved for a new trial when his wife recanted her testimony, claiming that she had lied at trial and that "she was pressured to do so by the State." *Id.* at 813, 867 P.2d at 1195. A new trial was denied because the witness had already admitted that she had lied to the defendant, the police, and defense counsel, and thus her recantation was merely cumulative of that admission. *Id.* Similarly, in this case Knight and Dunlap

admitted during trial that they had lied to the police and given inconsistent statements. The latest recantations of Knight and Dunlap are merely contradictory and impeaching.

{41} Finally, we agree with the trial court's assessment that Case corroborated the trial testimony and note from our review of the trial transcript that other evidence corroborated the testimony as well. Both Knight and Dunlap testified about their presence at the scene and provided details consistent with Mitchell being assaulted. Autry corroborated the presence of Dunlap and Case at the scene and provided details consistent with Mitchell having her clothes forcefully removed and having been beaten, including with a blunt instrument. Despite inconsistencies in the details, each witness incriminated Case. Case himself testified about his presence and that of Knight and Dunlap. Although he attempted to minimize what had happened to Mitchell, he did confirm that Worley had struck her and had removed her shirt.

{42} The forensic pathologist's findings corroborated the testimony of Dunlap and Autry that Mitchell's clothes were forcefully removed and that she had been beaten. According to the pathologist, when he received Mitchell's body, the zipper on her trousers had been pulled apart and her shirt was on inside-out. He also testified that her injuries were not consistent with a fall, but were consistent with a beating. Moreover, the pathologist testified that the vertical orientation of the abrasions on Mitchell's body were consistent with her body being dragged along the ground, which corroborates Dunlap's testimony.

{43} For the foregoing reasons, we conclude that the trial court did not abuse its discretion in denying the petition for writ of habeas corpus based on the recanted testimony. We conclude, consistent with the determination of the trial court, that the recanted testimony is not newly discovered. We next consider the *Brady* claim.

## IV. *BRADY* ISSUE

{44} Case claims that his right to due process was violated because the prosecution failed to disclose one of Autry's four taped

statements. This claim is based on *Brady*, in which the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. In order to establish a *Brady* violation, the petitioner "must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *Banks v. Reynolds*, 54 F.3d 1508, 1516 (10th Cir.1995).

■■■ {45} While the first element requires proof that the prosecution suppressed or withheld the evidence in question, it "does not require a finding of bad faith or any other culpable state of mind on the part of the prosecutor." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995) (footnote omitted); *see also Brady*, 373 U.S. at 87, 83 S.Ct. 1194 (noting that suppression of material exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution"). The focus of a due process analysis in *Brady* cases is on " 'the fairness of the trial, not the culpability of the prosecutor.' " *Smith*, 50 F.3d at 823 (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). Thus, it is irrelevant whether the prosecutor failed to disclose evidence either intentionally or negligently. *Chacon v. State*, 88 N.M. 198, 199, 539 P.2d 218, 219 (Ct.App. 1975).

{46} In addition, "the 'prosecution' for *Brady* purposes encompasses not only the individual prosecutor handling the case, but extends to the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects [of the case]." *Smith*, 50 F.3d at 824 (citation and footnote omitted); *accord State v. Wisniewski*, 103 N.M. 430, 435, 708 P.2d 1031, 1036 (1985).

■■■ {47} An alleged *Brady* violation is a charge of prosecutorial misconduct. *See State v. Trujillo*, 2002–NMSC–005, ¶ 48, 131 N.M. 709, 42 P.3d 814. The trial court's ruling on prosecutorial misconduct is re-viewed for abuse of discretion because "the 'trial court is in the best position to evaluate the significance of any alleged prosecutorial errors.' " *Id.* ¶ 49 (quoting *State v. Duffy*, 1998–NMSC–014, ¶ 46, 126 N.M. 132, 967 P.2d 807). The trial court should be upheld " 'unless its ruling [was] arbitrary, capricious, or beyond reason.' " *Id.* (quoting *Duffy*, 1998–NMSC–014, ¶ 46, 126 N.M. 132, 967 P.2d 807).

■■■ {48} The taped statement at issue in this case is one of four statements Autry gave to the police during the initial investigation of this case. The taped statement was found in the district attorney's files during the pendency of the habeas corpus proceedings. While all of Autry's other taped statements were transcribed, the statement at issue was not. During the habeas corpus evidentiary hearing, Case's attorney testified that, having reviewed the statement at issue, he did not believe he received either the tape or a transcription of the statement. The attorney was adamant that had this particular statement been available to him, he would have used it to cross-examine Autry because it showed that (1) Autry had previously had a sexual relationship with Mitchell, and (2) he was angry because he was unable to complete the sexual encounter. The fact that the attorney did not cross-examine Autry about these issues is what convinces the attorney that he did not receive the statement. During cross-examination the attorney noted that he had never had any difficulty getting evidence from the prosecution, and the prosecution has an open file policy.

{49} The district attorney, on the other hand, testified that he had no recollection of the taped statement. However, as discussed earlier, it is irrelevant for *Brady* purposes whether evidence was suppressed intentionally or negligently. It is also irrelevant whether the district attorney or the police were ultimately responsible for the suppression. Law enforcement personnel involved in an investigation are considered part of the prosecution for *Brady* purposes. Ultimately, we are not left with a clear answer about whether the taped statement was suppressed by the prosecution.

{50} The second *Brady* element is whether the suppressed evidence was favorable to the accused, either as impeachment or exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Case argues that the suppressed statement was favorable to him because (1) it could be used to impeach Autry, and (2) the statement was exculpatory evidence because it implicates Autry as the real perpetrator.

{51} Case argues that the statement's significance is that Autry admitted he had lied to the police about having a prior sexual encounter with Mitchell because he "didn't know if she was raped at the time or what, and [he] didn't want nobody to point the finger at [him] cause [he] didn't do it." Regarding the prior sexual encounter, Autry told the police that they were at the Flumes in his car. She took her bra and underwear off and

> we just laid there foolin' around, kissin' and stuff, and I was playing with her breasts, and then she just—I—I tried to— I got fixed up about half way in, and she said no, she pushed back, and I said alright. Then she said let's go on out to that party and I said well, let's go. Got dressed up and we both crawled back in the front seat of my car and we went out to the—we went by and got Mike and we went out to the party.

Later in the statement he reiterated that she had pushed him back, and added "[s]he got mad, said let's go to the party." The officer then asked him if he had gotten mad.

Q: Did you get mad?

A: No. I got—I got mad, yeah, but not, not that mad. I said well hell, ain't no great big loss to get turned down by a girl.

Q: You didn't get mad because she wouldn't let you?

A: Well—anybody'd get mad, but-I don't mean mad like in—like you're gonna do something like that to her. Just get kind of teed off or something.

Autry then agreed to provide samples of pubic hair, head hair, and blood. It is clear from the statement's context that this en-counter occurred prior to January 1, 1982. In a subsequent statement, he describes the encounter as occurring on December 19, 1981.

{52} During the murder trial, the prosecution asked Autry if he ever had sexual intercourse with Mitchell. Autry replied, "No, sir." The next question was whether Autry had ever tried to have sexual intercourse with Mitchell, and Autry answered, "Yes, sir." During re-direct, the prosecution asked if Mitchell was a pretty good-looking girl, and Autry answered yes, admitting that he found her attractive. When asked if she slept around, Autry answered that he did not know, but again acknowledged that he had unsuccessfully tried to have sexual intercourse with her. Defense counsel did not cross-examine Autry on these points either during his cross-examination or re-cross-examination.

{53} Case claims that the statement was critical impeachment evidence that would have cast doubt on Autry's credibility as a witness. It seems reasonable that the statement has some impeachment value. Therefore, the next question we must address is whether the statement was material to the defense. "[E]vidence is material [under *Brady* ] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375; *see also Trujillo*, 2002-NMSC–005, ¶ 50, 131 N.M. 709, 42 P.3d 814. Evaluating materiality under *Brady* requires us to look " 'at the entire trial to determine whether the defendant's conviction was obtained by violating due process, whether his or her trial was tainted with fundamental unfairness because certain evidence was not disclosed to the defense.' " *State v. Baca*, 115 N.M. 536, 541, 854 P.2d 363, 368 (Ct.App. 1993) (quoting *Trujillo v. Sullivan*, 815 F.2d 597, 612–13 n. 9 (10th Cir.1987)).

{54} In viewing Autry's taped statement within the context of the entire trial, we conclude that even had the statement been disclosed to the defense, there is no reasonable probability of a different result. Autry's credibility was already put into question at the trial, not only through an aggressive

cross-examination showing prior inconsistent statements, but through character witnesses who testified that Autry had a reputation for untruthfulness. Thus, the taped statement would have been cumulative of other evidence used to impeach Autry, and cumulative evidence is not considered material for *Brady* purposes. *Chavez*, 116 N.M. at 813, 867 P.2d at 1195. Materiality only exists if the suppressed evidence "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict....'" *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoted authority omitted).

{55} Case also argues that the taped statement was exculpatory because it implicated Autry as the perpetrator. According to Case, the defense would have used the taped statement to show that Autry had a motive to kill the victim because he was angry that she withdrew her consent to a sexual act at a time when he had achieved partial penetration. A defendant is entitled to defend against criminal charges by showing that a third person, and not the defendant, committed the crime charged. The defendant need not prove the third party's guilt beyond a reasonable doubt. However, evidence that another person had a motive to commit the crime for which a defendant is on trial is generally inadmissible, absent direct or circumstantial evidence linking the third person to the crime. *See State v. Rosales*, 2004-NMSC-022, 136 N.M. 25, 94 P.3d 768. In *Rosales*, a first-degree murder case, we considered whether the trial court erred in excluding evidence that a third person had a motive to murder the victim. In analyzing the issue we noted that courts in other jurisdictions have held that a third person's motive is not admissible, unless there is at least some other evidence to connect the third person to the offense. We cited the Alaska Supreme Court's case, *Smithart v. State*, 988 P.2d 583, 586 (Alaska 1999), as an example. We declined to recognize a special rule of admissibility of a third person's motive to commit the offense for which the defendant has been charged. Instead, we pointed out that our general rules of relevancy are adequate because the "rule addresses the concerns for admitting third person motive evidence expressed by the Alaska Supreme Court in *Smithart*." 2004-NMSC-022, ¶ 12, 136 N.M. 25, 94 P.3d 768. We concluded in *Rosales* that the proffered evidence that a third person had a motive to murder the victim to eliminate a debt was highly probative on the issue of the defendant's guilt or innocence. We were persuaded because "The statements at issue appear to have occurred only a couple of weeks before the murder. At trial, other evidence showed that [the third person] had recently threatened the life of the victim, the victim was killed in [the third person's] vehicle, and the murder weapon might have been a pocket knife owned by [the third person]." *Id.* ¶ 13. In this case, other than the alleged motive-that days or weeks before the murder, Autry became angry because he was unable to conclude a sexual act with Mitchell-Case has not pointed to the existence of other evidence, direct or circumstantial, which links Autry to Mitchell's murder. Although Dunlap confirmed Autry's presence during the night in question, he testified that he was not sure where Autry went when the attack on Mitchell began, and he did not see Autry again after the attack began. The motive itself is speculative. For *Brady* purposes, exculpatory evidence cannot be purely speculative. *See State v. Huber*, 2006-NMCA-087, ¶¶ 30-32, 140 N.M. 147, 140 P.3d 1096. We therefore agree with the trial court that the State did not suppress material evidence from Case, and the trial court did not abuse its discretion.

## V. CONCLUSION

{56} For the foregoing reasons, we affirm the district court and deny Case a writ of habeas corpus.

{57} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, PETRA JIMENEZ MAES, Justices, and JAMES A. HALL, Judge, sitting by designation.

RICHARD C. BOSSON, Justice (concurring in part and dissenting in part).

**36**

BOSSON, Justice (concurring in part and dissenting in part).

{58} I concur whole-heartedly with the author's analysis of the *Brady* issue, as well as the fundamental legal framework posited for evaluating newly-discovered evidence offered in a habeas petition many years after the original trial. This Opinion will well-serve the bench and bar for the clarity it brings to this important field. With great regret, however, I cannot join in the majority's decision to find that recantations in cases like this cannot be "newly-discovered" even if a trial court were to find them credible. For the following reasons, I would remand the case to the trial court for a determination of the credibility of the recantations.

{59} The credibility of a recantation is not so easily divorced from the significance of that recantation as newly-discovered evidence. A trial court's finding that a recantation is credible directly implicates our concern that a person should not be "incarcerated solely on the basis of lies," regardless of whether the recanting witness has previously wavered in his or her story. It seems contrary to our truth-seeking responsibilities to say that a credible recantation by a principal witness should be disregarded simply because the witness's credibility had previously been called into question at trial, and thus the *credible recantation* would add nothing new. Inherently, if a trial court finds that a recantation is believable, and by extension understands that a jury could have found it believable, it should not matter that there were inconsistent statements at trial. If a reviewing court believes the recanted testimony, and thus believes that the witness lied at trial, it follows that the incarceration is based upon lies, justifying judicial intervention. *See United States v. Earles*, 983 F.Supp. 1236, 1250 (N.D.Iowa 1997) (noting that "credibility of the recantation is the key to the impact of the recantation upon the probability that the recantation will lead to an acquittal"). A credible recantation would certainly constitute a new weapon that the defense did not previously have.

{60} Further, in evaluating credibility, trial courts should be allowed to consider both the circumstances surrounding the latest recantation that make it different from the inconsistencies presented at trial, as well as the fact that the recantation of sworn testimony under oath is itself something that a jury would not necessarily ignore. As noted by the Seventh Circuit in *United States v. Leibowitz*, "notwithstanding the perjured testimony was contradicted at the trial, a new light is thrown on it by the admission that it was false." 919 F.2d 482, 485 (7th Cir.1990) (quoted authority omitted).

{61} Using this case as an example, the witnesses testified that they felt guilty about lying at the trial and had been living with that guilt for many years. Audrey Knight had contacted Curtis Worley's father of her own accord, and arranged to meet with him so that she could "get it off her chest." Paul Dunlap had become religious and testified that when the law students asked him if he told the truth at trial, he was about to lie and say that he had, but he just could not go through with it, so he admitted that he had lied at Case's trial. He knew nothing of Knight's recantation at that time. At the habeas hearing, Dunlap insisted that he wanted to "do the right thing," even after being advised of his Fifth Amendment right against self-incrimination, and otherwise resisting pressure from the prosecution *not* to testify. These circumstances all add something beyond the original inconsistencies at trial, and they are not things that Petitioner could have uncovered pre-trial with due diligence.

{62} In my view, this case, as with most habeas cases involving recanted testimony, comes down to the trial court's essential function of testing the credibility of the recantations. The trial court should be instructed to perform that function, and if the trial court is persuaded that the recantations are credible, then relief should follow. I do not understand the cases cited by the majority in support of the notion that Knight's and Dunlap's recantations were not "newly-discovered" to say anything different. In none of those cases did the court find that a credible recantation was nonetheless insignificant. Further, each of those cases was either a review of a trial court's credibility determina-

 

tion or was a district court opinion, and each emphasized the critical role of the trial court in evaluating and deciding credibility. *See Olson v. United States,* 989 F.2d 229, 232 (7th Cir.1993) (court was persuaded in part "by the fact that the same district court judge who denied [the defendant's] most recent new trial motion presided over his trial and was able to view, weigh and analyze firsthand not only the witnesses' composure or lack thereof, but their testimony as well"); *United States v. Ramsey,* 761 F.2d 603, 604 (10th Cir.1985) ("The district court judge, who took the evidence and personally observed the witness as he testified, was in a much better position than this court to determine whether, even after noting [the witness's] frequent about-faces, his testimony was nonetheless sufficiently credible to support a jury verdict."); *Earles,* 983 F.Supp. at 1249 (explaining that "[t]he level of insulation the law grants to a skeptical trial judge's assessment of recanting affidavits reflects the notion that trial judges are in the best position to compare a witness's earlier testimony with his new version of the facts" (quoted authority omitted)); *see also State v. Chavez,* 116 N.M. 807, 812, 867 P.2d 1189, 1194 (Ct.App.1993) (noting that "[t]he trial court is in the best position to evaluate the evidence of prejudice" to the defense due to the State's failure to disclose the previous arrest of an important witness).

{63} It may be that in the case before us the trial judge would have no reason to believe Knight and Dunlap any more now than twenty-four years ago. Fair enough. But in a future case, let us suppose that every key witness were to recant and the lawyers were to come armed not only with recantations persuasive in themselves, but also with airtight alibi witnesses corroborating all of the recanting witnesses' testimony. In that event, would we flatly prohibit the trial judge from ordering a new trial simply because similar questions of credibility were hashed out twenty-four years earlier? I would leave the power in the trial judge to conclude in an appropriate case that a *credible,* persuasive recantation can itself be newly-discovered evidence, even though it suffers from all the weight that the majority attaches to it. In this instance, I would remand for the trial judge to determine the credibility of the recantations.