2006-NMCA-087

140 P.3d 1096

**STATE of New Mexico,
Plaintiff–Appellee,**

**v.**

**Robert HUBER, Defendant–Appellant.**

**No. 24,722.**

Court of Appeals of New Mexico.

May 31, 2006.

Certiorari Denied, No. 29,865,
July 21, 2006.

Patricia A. Madrid, Attorney General Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Appellee.

Inocente, P.C., Brian A. Pori, Albuquerque, NM, for Appellant.

## OPINION

WECHSLER, Judge.

{1} Defendant appeals his convictions for second degree murder, kidnapping (great bodily harm), conspiracy to kidnap, and related crimes. On appeal, Defendant claims (1) the evidence presented was insufficient to support his convictions; (2) the district court erred in denying his motion for a new trial; (3) the prosecution withheld material, exculpatory evidence; (4) his sentence violates the constitutional prohibition against cruel and unusual punishment; and (5) cumulative error requires reversal. We affirm.

## BACKGROUND

{2} This case presented the jury with numerous major and minor conflicts and discrepancies in witness testimony concerning the events surrounding the victim's beating and his physical condition after being taken from the scene. We consider these facts in detail in our discussion after analyzing them with deference to the verdict under the applicable standard of review. It is not disputed that on the evening of October 18, 2000, Defendant, Lincoln Hill, and Rudy Marquez were involved in the beating of the victim in this case, Ryan Bryant, over an unpaid debt for a consignment of hay. Bryant had previously moved from Arizona to Valencia County and had befriended Defendant. Defendant was the best man at Bryant's wedding and Bryant stayed at Defendant's house when Bryant and his wife were arguing. Bryant's wife testified that, notwithstanding their friendship, Defendant and Bryant often argued like siblings and physically fought on at least one occasion.

{3} Hill testified that three or four days before Bryant's beating, Hill was living and working at his mother's ranch when he was approached by Bryant, whom he did not know, about the availability of hay. Bryant told Hill that he had a friend with sixty roping steers that needed inexpensive feed, and that his friend would pay him on delivery. Hill agreed to sell the hay on consignment, and Bryant came back the next day for a second load, but never paid as promised. Hill determined from his caller ID that Bryant had called from Defendant's house. Hill's mother needed the money, so he proceeded to Defendant's house to collect the debt. When Hill arrived, Bryant opened his wallet, claiming to have a check, and assured Hill that he would cash the check and pay Hill when the bank opened in the morning.

{4} Bryant spent the day of October 17, 2000 with Toni Wagoner, who had rented a room at Defendant's home. Bryant agreed to pay to fix Wagoner's shattered car window in exchange for her driving him to various ranchers to collect money owed Bryant. The two dropped off the car to be fixed, spent the evening at Defendant's home, and spent the next day, October 18, 2000, driving around trying to collect the money allegedly owed to Bryant. Wagoner testified that Bryant only received money at one of the places they visited. She also stated that he briefly gambled while she submitted a job application at Isleta Casino. Bryant and Wagoner then returned to Defendant's home.

{5} During this period, Hill and his brother Marquez were looking for Bryant at local bars and made repeated calls to Defendant. Ultimately, Hill was informed by another brother that Defendant had called to say that if Hill wanted the money he should go to Defendant's house. Meanwhile, at Defendant's property, Defendant informed Bryant that he wanted to be taken to the liquor store before it closed. Bryant was sitting in the driver's seat of Wagoner's car, inside Defendant's fenced yard, when Defendant moved his own vehicle in front of the gate. Wagoner, who was sitting in the passenger's seat of her car, testified that Defendant then "came back walking to the car like he was mad and started to yell at [Bryant] and [Bryant] was sitting behind my steering wheel and he started getting on to [Bryant] about being a sorry puke and screwing his friends over."

{6} At this point, Troy Hibdon arrived, although there is conflicting testimony as to whether he parked his car outside or inside

the fenced yard. The State's theory was that Defendant had blocked off all exits so that he could hold Bryant until Hill arrived. Wagoner testified that Defendant was on the phone, telling the other party to hurry up because he did not know how much longer he could hold Bryant. She described Defendant as "getting madder and madder." Hill and Marquez soon arrived, with Hill testifying that they walked up and said hello to Defendant, who introduced them to Hibdon. Hill testified that they did not physically attack Bryant then, but merely approached him and asked him for the money. Wagoner's account differed; she testified that "[Bryant] was still in my car and I was still in my car and they started yelling at him and screaming at him and telling him what a sorry person he was and not to be screwing people over like he had been doing. . . . And next thing I know they were throwing blows at [Bryant]. . . ."

{7} Regardless of when the fighting began, at some point shortly after Hill and Marquez arrived, Bryant tried to assure them that his mother would soon be sending him a check for his birthday. In response, Defendant called Bryant's mother in Arizona. She subsequently testified that Defendant sounded very angry, that she told him that she was sending her son money, but that she refused to specify the amount. Hill testified that Defendant ended the conversation and announced that Bryant's mother was not going to be sending any money, which triggered the beating. Wagoner described Defendant as "addled, mad[,] frustrated, in a rage. Just thoroughly pissed off."

{8} The actual beating of Bryant by Hill, Marquez, and Defendant, like much of this case, presented the jury with numerous inconsistencies in the testimony. Defendant testified that he did not hit Bryant, but on the contrary picked up a rubber pole from a children's batting tee because he was scared, and that he told Hill and Marquez "no more, that's enough." Wagoner, Hill, Marquez, and Hibdon each testified that Defendant was involved in the beating to varying degrees, but all agreed that at some point Defendant used a baseball bat. Marquez noted that it was an aluminum bat. The beating began with Bryant trying to fend off the blows from the backseat of the car, but he was eventually dragged from the vehicle and was described as being "on all fours" while the beating continued. When the beating ended, Hill, Marquez, and Defendant left, and Wagoner and Hibdon took Bryant back to Hibdon's house. Again, the testimony is conflicting as to Bryant's physical condition at this time, but he deteriorated on the way back to Hibdon's house and was placed on the bathroom floor, where he died during the middle of the night.

{9} Hibdon informed Defendant the next morning that Bryant was dead. Defendant went to the Hibdon residence with Hill and Marquez, where Justin Brown was also present. Defendant testified that he told the others that they should call the police, although this testimony was contradicted by testimony that Defendant paid Brown to dispose of the body. In any event, after some discussion, it was decided that they would not contact the police, but would instead dispose of the body. Hill, Marquez, and Brown then proceeded to a remote location, where they buried the body. On December 1, 2000, Bryant's wife reported him missing. Bryant's body was not discovered until April 2, 2001, when a passerby walking his dog came upon the remains.

## SUFFICIENCY OF THE EVIDENCE

{10} Defendant challenges the sufficiency of the evidence to support the second degree murder conviction, with the specific assertion that the evidence is lacking that his actions constituted a significant, proximate cause of Bryant's death. Defendant also contends that the evidence did not support the kidnapping and conspiracy convictions.

## STANDARD OF REVIEW

{11} A sufficiency of the evidence review involves a two-step process. Initially, we view the evidence in the light most favorable to the verdict, a process that prevents us from re-weighing the evidence. *See State v. Sutphin*, 107 N.M. 126, 130–31, 753 P.2d 1314, 1318–19 (1988). Then we must "make a legal determination of whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been estab-

lished beyond a reasonable doubt." *State v. Apodaca,* 118 N.M. 762, 766, 887 P.2d 756, 760 (1994) (internal quotation marks and citation omitted). Sufficient evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Salgado,* 1999–NMSC–008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted).

{12} As indicated, this case presented the jury with significant factual conflicts. Once the jury resolved these conflicts, it was still necessary to rely heavily on reasonable inferences that could be derived from these facts. In his recitation of the standard of review, Defendant refers us to the oft-cited passage that "[e]vidence equally consistent with two hypotheses tends to prove neither." *Herron v. State,* 111 N.M. 357, 362, 805 P.2d 624, 629 (1991). As we explain below, however, once we look at the facts in the light most favorable to the verdict, along with the reasonable inferences that may be derived therefrom, we believe that Defendant is actually advocating the position that the evidence used to support the conviction must be devoid of any reasonable inference of innocence. This specific standard of reviewing the evidence has been disavowed by our Supreme Court. *State v. Garcia,* 2005–NMSC–017, ¶ 18, 138 N.M. 1, 116 P.3d 72.

**SECOND DEGREE MURDER**

■ {13} To find Defendant guilty of second degree murder, the jury was required to find that Defendant killed Bryant, that Defendant knew that his acts "created a strong probability of death or great bodily harm," and that Defendant "did not act as a result of sufficient provocation." *See* UJI 14–210 NMRA. The State must also prove that Defendant's actions were a "significant cause of the death" of Bryant. *See* UJI 14–251 NMRA. "[S]ignificant cause" is "an act which, in a natural and continuous chain of events, uninterrupted by an outside event, resulted in the death and without which the death would not have occurred." *Id.* Because there was evidence that Defendant was not the only one involved in the beating, the jury was also instructed as follows: "There may be more than one significant cause of death. If the acts of two or more persons

significantly contribute to the cause of death, each act is a significant cause of death." *Id.*

{14} In his brief-in-chief, and again in his reply brief, Defendant refers us to selective pieces of evidence that cast doubt on the sufficiency issue. However, we disregard this evidence and consider the following evidence that supports the jury verdict in this case. As indicated, the State's theory was that Defendant deceptively held Bryant until Hill and Marquez arrived, that he incited the ferocity of the beating, and that he inflicted the deadly blows by use of an aluminum baseball bat. This theory is supported by the testimony of Wagoner, Hibdon, Hill, and Marquez. Wagoner's testimony indicates that Defendant had orchestrated the beating, blocking the gate with his truck and informing someone on the phone to "hurry up" because he did not know how long he could hold Bryant. Contrary to Defendant's testimony that he played no role in the fight, Wagoner testified that Defendant was "throwing blows and punches too." Wagoner's eyewitness account is limited, because at some point Hibdon held her on the ground away from the fight. She did testify that Defendant, Hill, and Marquez were "kicking the shit out of him from both doors" when Bryant was in the vehicle and that she believed that Bryant had made it through the beating when he stood up and brushed himself off. However, Wagoner testified the beating resumed outside of the vehicle: "[Defendant] started saying something about screwing people over and it got those two big ole boys mad again and they started kicking the shit out of him again until he couldn't get up no more and I could hear the air being let out of him. . . ." She questioned "[w]hy it took three to teach him a lesson." She also testified that Defendant was the only one who used a weapon, a baseball bat. Again, her account was limited because Hibdon had been keeping her away from the fight: "When I finally got away from [Hibdon], [Defendant] was lifting the bat off like he was going to hit [Bryant], like he had just hit [Bryant] and he was going to hit him again and I came around the side of the house and said what are you doing and he throws the bat backwards and said I never hit him. . . ."

Wagoner testified that she never saw the bat hit Bryant.

{15} The jury was able to rely on the testimony of Hibdon to fill in the gaps with respect to the contact issue, and as further evidence that Defendant orchestrated the beating. Hibdon testified that Defendant called him shortly before the beating, stating that Bryant had been "back to his normal tricks," meaning that he had been "ripping people off," and that Defendant asked him to come and help him keep Bryant there until Hill and Marquez arrived. Hibdon testified that Bryant was sitting inside Wagoner's car, inside the blocked fenced yard, when he arrived 30 to 45 minutes later. Hill and Marquez arrived shortly thereafter. When the fighting began, Hibdon saw Defendant "[j]abbing" Bryant "[h]ard" with the baseball bat when Bryant was still in the vehicle. The brutality of the beating escalated when Bryant was dragged out of the car by the three men. Defendant was hitting Bryant with the baseball bat while Bryant was being held by Marquez. Hibdon further testified that when Marquez was on top of Bryant, Defendant was hitting Bryant by swinging the bat like a golf club. Hibdon testified that while this was happening Defendant was "telling [Marquez] to hold his arm out trying to bust his arm so he wouldn't [steal]." Hill corroborated this testimony, stating that Defendant was yelling, "Let's break his arms and leg[s]." As indicated, the testimony of Hill and Marquez was similar to that of Hibdon and Wagoner, and contrary to that of Defendant, with respect to Defendant arming himself with a bat. Hill testified that Defendant was "poking him and hitting him with the bat," describing the force as "hard." Marquez testified that he believed that Defendant's use of the bat was unnecessary and that he didn't know "how many times [Defendant] continued hitting [Bryant]."

{16} The above evidence indicates that Defendant inflicted blows in the beating that created a strong probability of death. Bryant's condition after the beating was therefore critical to the State's case. Defendant refers us to evidence that supports the view that Bryant's physical condition after the beating was not grave. For example,

Marquez testified that Bryant "was a little bruised. No one really got any shots, they couldn't get him." Hill also testified that Bryant did not appear to be badly injured after the fight and that he was coherent, standing, and not bleeding. As we have noted, however, we disregard this evidence in determining sufficiency. *See State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (noting that, in determining sufficiency, we review the evidence in the light most favorable to the verdict and "disregard all evidence and inferences to the contrary"); *State v. Sarracino*, 1998–NMSC–022, ¶ 24, 125 N.M. 511, 964 P.2d 72 (observing that "although contrary evidence is presented which may have supported a different verdict, the appellate court will not weigh the evidence or foreclose a finding of substantial evidence") (internal quotation marks and citation omitted); *State v. Roybal*, 115 N.M. 27, 30, 846 P.2d 333, 336 (Ct.App.1992) (noting that it is for the factfinder to evaluate the weight of the evidence, to assess the credibility of the various witnesses, and to resolve any conflicts in the evidence).

{17} Turning to the evidence that supports the verdict, Hibdon testified that the fighting ended when he "yelled at them he had enough." He further stated that "[t]hey" wanted to keep Bryant at Defendant's house until they determined whether Bryant's mother was sending money. Hibdon testified that Wagoner was afraid of what would happen if they left Bryant there, so he decided to take Bryant and did so after they agreed to his offer to pay them if Bryant escaped. Hibdon described Bryant as "beat up bad" but somewhat coherent. Hibdon took Bryant in Wagoner's car, with Wagoner following behind in Hibdon's vehicle. Hibdon testified that Bryant's condition got worse along the way: "[h]e was mumbling, it seemed he was going in and out of coherence and then he would sit there and then yell 'don't' like someone was still trying to hit him." Bryant was described as swinging his arms and "dreaming that someone was hitting him." When they arrived at Hibdon's house, Bryant was assisted out of the vehicle and once inside he acted like he was "starting to have dry heaves or he was going to get sick or something," so Hibdon placed him on

the bathroom floor, where he died during the course of the evening. Hibdon testified that the next morning when Defendant, Hill, and Marquez arrived, Defendant announced that "it couldn't have happened to a better person. [Bryant] got what he deserved."

{18} Wagoner likewise testified that Bryant's condition was grave when he reached Hibdon's house. She described Bryant being carried into the home and placed on the bathroom floor, with a swollen head, and she described how she could not see his eyes because of the swelling. She testified that Bryant never regained consciousness. She stated that about three or four weeks after the incident Defendant came to her home and he "was mad, telling me I better shut my mouth or he was going to shut it for me."

{19} The State presented the testimony of Dr. Ross Zumwalt, a physician and the chief medical examiner for the Office of the Medical Investigator. Dr. Zumwalt testified that, in his opinion, Bryant died of homicidal violence, even though he conceded that the body had been largely eaten away and that no blunt force injuries were identifiable. There were no identifiable fractures, although some ribs were missing. Defendant focuses on Dr. Zumwalt's inability to support his opinion testimony about the cause of death with any physical marks of violence. However, the other evidence indicates that Bryant was severely beaten and died shortly thereafter. The issue is not whether Bryant died from the violence of that evening, but whether there is sufficient evidence that the blows inflicted by Defendant constituted a significant cause of Bryant's death. *See* UJI 14–251. Dr. Zumwalt testified about physical characteristics of head injuries and internal bleeding, and how they lead to death. He also noted that fist strikes to the head or abdomen can result in death and that the absence of a skull fracture does not rule out a head injury in this case.

{20} In summary, the jury was presented with evidence that Defendant orchestrated the beating, that he used both his fists and the baseball bat to hit Bryant, that Bryant's condition worsened shortly thereafter, and that Bryant died. These basic facts, along with the expert testimony that the lack of visible fractures did not rule out a fatal head injury or internal bleeding, permitted the jury to make a reasonable inference that the acts of Defendant constituted a significant cause of Bryant's death and that there was no other independent event that broke the chain of events from the beating to Bryant's death. *See id.* Finally, the jury could reasonably infer that Defendant's payment for the disposal of the body indicated that he knew he was responsible for Bryant's death. *See State v. Chavez,* 116 N.M. 807, 815, 867 P.2d 1189, 1197 (Ct.App.1993) (noting that the defendant's role in disposal of decedent's body constituted "evidence from which the jury could have inferred that [d]efendant was conscious of his guilt").

## KIDNAPPING AND CONSPIRACY TO KIDNAP

{21} The jury was instructed that in order to convict Defendant of kidnapping, the evidence had to show that Defendant took, restrained, confined, or transported Bryant by force, intimidation, or deception, with the intention to hold Bryant against his will to inflict death or physical injury, or for the purpose of making Bryant do something or keeping Bryant from doing something. *See* UJI 14–403 NMRA.

{22} As indicated from our discussion above, there was sufficient evidence for the jury to conclude that Defendant deceptively restrained Bryant so that he could be physically beaten by Defendant, Hill, and Marquez. Wagoner's testimony supports the view that Defendant was able to confine Bryant in Wagoner's vehicle, inside the yard, by using the ruse that Defendant wanted Bryant to drive him to the liquor store. *See State v. Garcia,* 100 N.M. 120, 124, 666 P.2d 1267, 1271 (Ct.App.1983) (noting that kidnapping by deception requires "either affirmative acts intended to delude a victim or omissions that conceal the intent and purpose of an accused"). With his ruse in place, instead of getting into the passenger side of the vehicle, Defendant "took off running," blocked the gate with his truck, and angrily came back to the car, referring to Bryant as a "sorry puke" and accusing Bryant of "screwing his friends over." Defendant then

got on the telephone and was heard saying that he did not know how long he could "hold" Bryant.

{23} Defendant contends that Bryant was not confined because other exits were not blocked. However, there is evidence that indicated that Defendant's use of his truck to block the gate effectively confined Bryant to the yard. Wagoner testified that when Hibdon arrived he had to park outside of the gate because it was blocked. Hill and Marquez likewise parked outside of the gate. Hill testified that when he arrived at Defendant's house he parked on the road because Defendant's truck was blocking the gate. Hibdon's testimony also supports the State's kidnapping theory. He stated that Defendant had called him and asked him to come and help detain Bryant there until Hill and Marquez arrived. Hibdon further testified that Bryant was sitting inside Wagoner's car, inside the blocked fenced yard, when he arrived 30 to 45 minutes later. Hibdon parked outside the fence because Defendant's truck was blocking one gate, and the other gate was closed. In addition to the deceptive confinement, Defendant's anger and his immediate involvement in the fight upon the arrival of Hill and Marquez leads to the reasonable conclusion that he had held Bryant so that he could be physically beaten for what Defendant referred to as Bryant's "normal tricks."

{24} The evidence set forth above also supports the conspiracy conviction. The jury could reasonably infer that Defendant agreed with Marquez and Hill to commit kidnapping by holding Bryant against his will in order to inflict physical injury. *See* UJI 14–2810 NMRA. Their concerted efforts to hold Bryant and then beat him are sufficient evidence of a shared intent. *See State v. Vigil,* 110 N.M. 254, 255, 794 P.2d 728, 729 (1990) ("Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence.") (internal quotation marks and citation omitted).

## MOTION FOR A NEW TRIAL

{25} Defendant contends that the district court erred in denying his motion for a new trial based upon newly discovered evidence. We initially note that the State claims that Defendant does not have a right to challenge the denial of this motion, because there is no final, written order, or because Defendant otherwise waived the issue by filing his notice of appeal before the district court could act, thereby divesting the district court of jurisdiction. *See Kelly Inn No. 102, Inc. v. Kapnison,* 113 N.M. 231, 241, 824 P.2d 1033, 1043 (1992) (noting that the filing of the notice of appeal divests the trial court of jurisdiction to take further action that would affect judgment on appeal), *modified on other grounds, Trujillo v. Hilton of Santa Fe,* 115 N.M. 397, 851 P.2d 1064 (1993). The State's argument misconstrues the procedural history of the motion. Defendant filed two motions for a new trial. Only the second motion, filed in open court on the day of the August 12, 2003 hearing, is relevant. At the end of the hearing, the district court announced that it would take the matter under advisement. It did not enter an order within thirty days, and the motion was therefore deemed automatically denied under Rule 5–614(C) NMRA. On October 6, 2003, well past the automatic denial date, the district court issued a letter decision indicating that it would grant Defendant a new trial. On October 27, 2003, the State filed a motion seeking the entry of an order denying Defendant's motion for a new trial. A second hearing was then held, at the end of which the district court orally announced that it was denying Defendant's motion for a new trial.

{26} As indicated, the State claims that Defendant cannot challenge the denial of his motion for new trial because there is no final, written order, or that he otherwise waived the issue. However, the chronology set forth above indicates that Defendant's motion was automatically denied when the district court did not act on it within thirty days from the August 12, 2003 filing. Rule 5–614(C). The State argues that we should not apply Rule 5–614(C) because the district court never considered whether it had jurisdiction after thirty days. However, the interpretation of Rule 5–614(C) is an issue of law, which we consider de novo. We construe the post-automatic denial letter decision granting the motion as an attempt to revive the issue

notwithstanding the procedural denial, although we do not comment on the district court's authority to do so under these particular facts. *Cf. State v. Ratchford*, 115 N.M. 567, 571, 855 P.2d 556, 560 (1993) (holding that automatic denial was not effective when district court had orally announced its intention to grant a new trial before the date the motion would be deemed denied). The district court ultimately announced that it would deny Defendant's motion. As such, the State's attempt to bar review of this issue for lack of a final, written order fails as a matter of law because the motion was deemed automatically denied.

■ {27} As to the merits, Defendant's motion relied primarily on allegations made by Mabel Garcia. Garcia testified at the August 12, 2003 hearing that she had been Troy Hibdon's friend for about nine years and described his occupation as a methamphetamine "cook." She stated that Hibdon confessed to her that he had killed Bryant. Specifically, she testified that Hibdon beat Bryant up while on the way back to Hibdon's house and that Hibdon later gave Bryant the "final blow" when Bryant was lying on the bathroom floor. The State did not cross-examine Garcia. Instead, the State subsequently maintained that her testimony did not satisfy the test for newly-discovered evidence. In order to warrant a new trial on the basis of newly-discovered evidence, a defendant must show that the evidence meets six criteria:

(1) it will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it could not have been discovered before the trial by the exercise of due diligence; (4) it must be material; (5) it must not be merely cumulative; and (6) it must not be merely impeaching or contradictory.

*State v. Litteral*, 110 N.M. 138, 144, 793 P.2d 268, 274 (1990). "We will not disturb the trial court's denial of a motion for a new trial unless the ruling is arbitrary, capricious or beyond reason." *Id.*

■ {28} However, at the subsequent hearing on the State's motion to reconsider, the State presented evidence that Defendant failed to satisfy the third prong, because Garcia could have been discovered through the exercise of due diligence. Ordinarily we consider only evidence that was before the court at the time of the final order from which an appeal is taken. *Cf. Gallegos v. City of Albuquerque*, 115 N.M. 461, 466, 853 P.2d 163, 168 (Ct.App.1993) (refusing to consider supplemental evidence not before the worker's compensation administration at the time of its ruling). In these unusual circumstances, in which the district court considered additional evidence after an automatic procedural denial of Defendant's motion for a new trial and later announced its intention to deny the motion, we will examine evidence that was before the court at the time the denial was announced. Principles of judicial efficiency mandate that we not remand to enable the court to hear evidence it has already considered and incorporated into its ruling. *See generally Executive Sports Club, Inc. v. First Plaza Trust*, 1998–NMSC–008, ¶ 11, 125 N.M. 78, 957 P.2d 63 (emphasizing the importance of promoting judicial economy in interpretation of rules of appellate procedure).

{29} The evidence at the later hearing clearly supports the district court's denial of the motion for a new trial. Garcia had testified that she had been "on the run" for four months, including the January 21, 2003 trial date. Accordingly, Defendant claimed she was a fugitive who could not be discovered. However, based on exhibits tendered by the State, the district court took judicial notice of the fact that one of Defendant's attorneys in this case represented Garcia in two cases during the time that Defendant's case was pending. The State also presented evidence through the testimony of Rose Yguado, the keeper of records at the Valencia County Detention Center. She indicated that Garcia was incarcerated between January 2, 2003, and April 9, 2003. The district court specifically determined that, contrary to Garcia's claim, she was incarcerated at the time of trial and therefore would have been available to testify. In addition, the district court indicated that the initial letter ruling was based on Garcia's testimony that she was "on the run" when the trial took place, when in fact she was in jail. Given this inconsistency,

the district court was within its discretion to conclude that Defendant had not offered sufficient proof that Hibdon had perjured himself. *See State v. Casteneda,* 97 N.M. 670, 678, 642 P.2d 1129, 1137 (Ct.App.1982) (noting that "courts must require the [newly discovered] evidence to affirmatively establish the perjury in such clear and convincing manner as to leave no reasonable doubt that perjury was committed").

## DUTY TO DISCLOSE

{30} Defendant claims that the State withheld material, exculpatory evidence, denying him the right to a fair trial. *See generally Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Rule 5–501(A)(6) NMRA implements *Brady* by providing that the State has a duty to disclose "any material evidence favorable to the defendant which the state is required to produce under the due process clause of the United States Constitution." Evidence is considered material for due process purposes if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed. *See State v. Baca,* 115 N.M. 536, 541, 854 P.2d 363, 368 (Ct.App.1993).

{31} Defendant alleges three individual violations, all of which he raised in post-trial proceedings. First, he claims that the State failed to disclose the contents of an interview of Defendant that was conducted by Sheriff's Detective Sergeant James Purdy, who testified that Defendant was "evasive and dishonest." Second, Defendant claims that the State should have disclosed the tape made from the body wire of an individual who had attempted to get incriminating statements from Defendant. Third, Defendant claims the State should have disclosed the existence of bloody towels allegedly owned by Bryant that were taken from the home of Hibdon.

{32} The prosecutor in this case disputed Defendant's basic allegation, stating that the State had opened its entire file to defense counsel. In denying Defendant's claims, the district court could have simply deemed this case to be one in which defense counsel lacked due diligence in examining the State's evidence. *See State v. Altgilbers,* 109 N.M. 453, 463, 786 P.2d 680, 690 (Ct.App.1989)

(noting that *Brady* does not impose obligation when a defendant already has access to the information or can access it through exercise of due diligence). More significantly, however, Defendant has not referred us to anything in the record to support the view that there is a reasonable probability that full disclosure would have led to a different result. His argument that the evidence was exculpatory is purely speculative. *See In re Ernesto M., Jr.,* 1996–NMCA–039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice."). In short, Defendant has not established materiality on the record before us.

## CRUEL AND UNUSUAL SENTENCE

{33} Defendant contends that his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article II, Section 13 of the New Mexico Constitution. Defendant was sentenced to fifteen years for second degree murder, eighteen years for kidnapping, and three years for conspiracy to kidnap, all to run concurrently. Defendant also received consecutive eighteen month sentences for tampering with evidence, conspiracy to tamper with evidence, and two counts of bribery of a witness.

{34} Defendant concedes that he did not preserve this issue for appellate review. *See State v. Burdex,* 100 N.M. 197, 201, 668 P.2d 313, 317 (Ct.App.1983) (holding that constitutional claim of cruel and unusual punishment is non-jurisdictional and must be preserved for appellate review). Nevertheless, Defendant asserts that his sentence constitutes fundamental error. "Fundamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand." *State v. Baca,* 1997–NMSC–045, ¶ 41, 124 N.M. 55, 946 P.2d 1066.

{35} Defendant's claim is predicated on the factual assertion that he "did not kill Mr. Bryant, he did not repeatedly assault him, and he did not help to bury him." As indicated above, however, the jury in this case necessarily did find that Defendant killed

Bryant, and there was evidence that Defendant repeatedly assaulted Bryant and paid Brown to dispose of the body. Accordingly, Defendant's claim is without merit.

## CUMULATIVE ERROR

{36} Defendant contends that we should set aside the conviction under the cumulative error doctrine. "The doctrine of cumulative error requires reversal when a series of lesser improprieties throughout a trial are found, in aggregate, to be so prejudicial that the defendant was deprived of the constitutional right to a fair trial." *State v. Duffy*, 1998–NMSC–014, ¶ 29, 126 N.M. 132, 967 P.2d 807. Defendant claims that this error consisted of the lack of sufficient evidence, prosecutorial misconduct, a disproportionate sentence, and the omission of evidence that someone else may have murdered Bryant. Having ruled against Defendant on each of these claims, the doctrine of cumulative error does not apply in this case. *State v. Aragon*, 1999–NMCA–060, ¶ 19, 127 N.M. 393, 981 P.2d 1211 (holding that when there is no error, there is no cumulative error).

## CONCLUSION

{37} For the reasons discussed above, we affirm the district court.

{38} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, and CYNTHIA A. FRY, JJ.