This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                       **NO. 31,354**

**ISRAEL BUSTILLOS,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Reed Sheppard, District Judge**

Gary K. King, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

D. Chipman Venie
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**VIGIL, Judge.**

{1}    On December 22, 2007, Defendant's five-month-old daughter, Baby Geovanny,

died while in Defendant's care. Baby Geovanny's autopsy revealed she had died of blunt force trauma to her head. Defendant was charged with one count of child abuse resulting in death or great bodily harm, intentionally inflicted, negligently inflicted, or negligently permitted, and an additional count of child abuse because the autopsy revealed older injuries as well. The jury found Defendant guilty of one count of child abuse, negligently caused death or great bodily harm, in violation of NMSA 1978, Section 30-6-1(D) (2009), and acquitted Defendant of the remaining charges. This appeal followed. We affirm.

**ANALYSIS**

{2} Defendant raises the following seven issues on appeal:(1) the State failed to provide sufficient evidence that Defendant negligently caused Baby Geovanny's death beyond a reasonable doubt; (2) the testimony of the supervising forensic pathologist regarding Baby Geovanny's autopsy violated the Confrontation Clause; (3) the trial court erred in not permitting Defendant to introduce evidence of pertinent character traits; (4) the trial court erred in denying Defendant's request for a continuance so that his expert could testify in person; (5) the trial court erred in allowing the testimony of a rebuttal witness; (6) the trial court erred in denying Defendant's motion for a new trial due the rebuttal witness's alleged perjury; and (7) the prosecutor committed reversible error under *Brady* for allegedly failing to produce exculpatory evidence. We

address each issue in turn below.

## 1. Sufficiency of the Evidence

{3}     Defendant argues that the evidence presented at trial was insufficient to support the guilty verdict for child abuse negligently causing Baby Geovanny's death. After an examination of the record, we conclude that the evidence was sufficient and affirm.

## A. Facts

{4}     On the morning of December 22, 2007, police responded to a 911 call that an infant (Baby Geovanny) had stopped breathing. Paramedics were already present and administering CPR on Baby Geovanny when police arrived. Defendant told police that he was caring for Baby Geovanny and his two-year-old son while his girlfriend, the children's mother, went to work. He said that Baby Geovanny had recently been diagnosed with an ear infection and was acting fussy that morning. He also said that he had given her a bath to try to sooth her and placed her in her crib, before cooking breakfast for his son. Defendant told police that he then realized that Baby Geovanny had stopped crying. When he went to check on her, he found that she was not breathing and was cold to the touch. He then called Baby Geovanny's maternal grandmother, Lucy Hermosillo, and told her Baby Geovanny was not breathing. Ms. Hermosillo asked him why he was calling her instead of 911. She then sped to Defendant's apartment. According to Ms. Hermosillo, it took her three to five minutes

to arrive, and evidence showed Defendant called 911 after she arrived. Defendant told police he had panicked. Ms. Hermosillo performed CPR until the paramedics arrived. The attempts to resuscitate Baby Geovanny failed and she died at the scene.

{5}     Baby Geovanny's autopsy revealed that although the only sign of external injury was a superficial scratch on her back by her neck that showed signs of healing, she had several internal injuries that indicated she had suffered head trauma. Her internal injuries included a hemorrhage deep in her brain, a laceration or tear on her brain, and two recent bruises on her skull. She also had older injuries, including hemorrhages around her optic nerves that were covered in new blood indicative of recent trauma on top of old injury, a subdural hematoma that was at least four days old but also had fresh blood on it that could have come from the day she died, a brain hemorrhage on the front part of her brain, a rib fracture callus, and a pelvic fracture callus.

{6}     The forensic pathologist from the Office of the Medical Investigator (OMI) that supervised the autopsy, Dr. Michelle Barry-Aurelius, testified that in her opinion Baby Geovanny died of blunt force trauma to the head and the manner of death was homicide. She explained that shaking a baby, throwing a baby, or hitting a baby's head against something hard can cause optic nerve sheath hemorrhages and that shaking a baby or a head impact could have caused the tear on her brain. She also

4

testified the dying brain cells she saw in Baby Geovanny's brain indicated that Baby Geovanny would have been unconscious or comatose within seconds of the head trauma and that Baby Geovanny survived in this comatose state for a few hours before dying. Approximately three and one-half hours passed from the time the mother left for work and the time Defendant called 911 to report that Baby Geovanny had stopped breathing.

**B.      Standard of Review**

{7}      In examining Defendant's claim, we review "whether substantial evidence exists of either a direct or circumstantial nature to support a verdict of guilty beyond a reasonable doubt with respect to each element of the crime charged." *State v. Chavez*, 2007-NMCA-162, ¶ 9, 143 N.M. 126, 173 P.3d 48. In making this determination, "we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Quinones*, 2011-NMCA-018, ¶ 37, 149 N.M. 294, 248 P.3d 336 (internal quotation marks and citation omitted); *accord State v. Reyes*, 2002-NMSC-024, ¶ 43, 132 N.M. 576, 52 P.3d 948, *abrogated on other grounds by Allen v. LeMaster*, 2012-NMSC-001, 267 P.3d 806. "We do not weigh the evidence or substitute our judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Chavez*, 2007-NMCA-162, ¶ 9 (alteration, internal

5

quotation marks, and citation omitted).

**C.    Discussion**

{8}    Defendant was convicted of criminally negligent child abuse resulting in death or great bodily harm for Baby Geovanny's death. Child abuse "consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." *See* NMSA 1978, § 30-6-1(D)(1) (2009).  In this context, "'negligently' refers to criminal negligence and means that a person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." Section 30-6-1(A)(3).

{9}    We review Defendant's claim of insufficient evidence through the lens of the jury instructions for negligent child abuse resulting in death or great bodily harm. *See Quinones*, 2011-NMCA-018, ¶ 38 ("The sufficiency of the evidence is assessed against the jury instructions because they become the law of the case.").  In order to find Defendant guilty of this count, the jury was required to find that: (1) Defendant caused Baby Geovanny "to be placed in a situation which endangered the life or health of [Baby Geovanny]"; (2) Defendant "acted with reckless disregard and without justification"; requiring a finding that Defendant knew or should have known that his "conduct created a substantial and foreseeable risk"; that he disregarded that risk and

6

that he "was wholly indifferent to the consequences of the conduct and to the welfare and safety of [Baby Geovanny]"; (3) "[Defendant's] actions or failure to act resulted in the death of or great bodily harm to [Baby Geovanny]"; (4) [Baby Geovanny] was under the age of 18"; and (5) "This happened in New Mexico on or about the 22nd day of December, 2007." *See* UJI 14-602 NMRA.

{10}     Defendant contends that there was insufficient evidence to support a finding that he was "*wholly* indifferent to the consequences of the conduct and to the welfare and safety of [Baby Geovanny]" because he took at least four different actions trying to save her. Defendant then describes the actions he took *once he discovered that Baby Geovanny was not breathing*. He insists that the jury must have concluded that Defendant did nothing when he found Baby Geovanny in medical distress in order to find him guilty. He intimates his behavior amounted to ordinary negligence, which he points out is not sufficient. *See State v. Massengill*, 2003-NMCA-024, ¶ 45, 133 N.M. 263, 62 P.3d 354 ("Our Supreme Court has determined that 'the child abuse statute contains no indication that the [L]egislature intended felony punishment to attach to ordinary negligent conduct.'" (quoting *Santillanes v. State*, 1993-NMSC-012, ¶ 31, 115 N.M. 215, 849 P.2d 358)). However, Defendant's arguments overlook the fact that the jury may not have necessarily considered any of his actions *after* he found Baby Geovanny unresponsive in reaching its guilty verdict. He was not convicted of

7

child abuse due to medical neglect resulting in death or great bodily harm, where his actions after finding his child in need of medical attention would have been relevant. *See, e.g., State v. Nichols*, 2013-NMCA-___, ¶ 1, ___ P.3d ___ (No. 30,783, Dec. 20, 2013) (affirming the defendant's conviction for child abuse due to medical neglect resulting in death or great bodily harm in case where evidence showed that the defendant knew or should have known his son needed medical treatment, failed to obtain medical treatment, and that failure caused the infant's death or great bodily harm).

{11} In this case, the jury heard testimony that: Baby Geovanny died from a blunt force injury to her head, which could have resulted from a blow, being struck by an object, falling on an object, or being violently shaken; her brain injury was inflicted with the force of falling out of a building over three stories high; the manner of death was homicide; due to her brain injury Baby Geovanny would have "immediately to within seconds be either comatose or difficult to arouse"; Baby Geovanny would have survived in this comatose state for a minimum of two hours due to the hypoxic injuries in her brain; Baby Geovanny was awake when her mother left for work; Baby Geovanny was left in Defendant's care for the three hours prior to her death, and that the only other person present during this time, Defendant's two-year-old son, could not have caused Baby Geovanny's injuries under the circumstances. This is all

8

circumstantial evidence that Defendant was responsible for the injuries to Baby Geovanny that killed her. The sheer volume and severity of the injuries support the conclusion that he was wholly indifferent to her welfare and the consequences of his actions when he inflicted the injuries. Viewing this evidence in the light most favorable to the verdict, we conclude that a reasonable jury could have found that Defendant committed criminally negligent child abuse resulting in Baby Geovanny's death.

**2.      Dr. Barry's Testimony and the Confrontation Clause**

{12}      Defendant contends that because another pathologist, Dr. Timothy Williams, actually performed Baby Geovanny's autopsy, Dr. Barry was merely parroting another expert's findings and conclusions in violation of his Sixth Amendment right to confront the witnesses against him. *See* U.S. Const. amend. VI (stating that every criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him"). The State responds that Defendant's right of confrontation was not violated because Dr. Barry testified to her own expert opinion based upon her personal knowledge and review of the evidence. After reviewing the record, we agree with the State.

**A.      Facts**

{13}      Dr. Williams was a forensic pathology fellow under the supervision of Dr.

Barry when he performed Baby Geovanny's autopsy. Dr. Williams testified at Defendant's grand jury indictment; he did not testify at Defendant's trial. Instead, Dr. Barry testified at trial regarding the injuries found in Baby Geovanny's autopsy and her opinion as to the cause and manner of death.

**B.    Standard of Review**

{14}    Defendant's Confrontation Clause claim is an issue of law that we review de novo. *State v. Lasner*, 2000-NMSC-038, ¶ 24, 129 N.M. 806, 14 P.3d 1282.

**C.    Discussion**

{15}    The Confrontation Clause bars out-of-court testimonial hearsay "'unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.'" *State v. Cabezuela*, 2011-NMSC-041, ¶ 49, 150 N.M. 654, 265 P.3d 705 (quoting *State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280). "The controlling question in a case involving an alternative expert witness . . . is whether the analyst's testimony 'was an expression of his own opinion or whether he was merely parroting' or 'merely repeating the contents of [the] report or the opinion of the analyst who is unavailable for cross-examination.'" *State v. Gonzales*, 2012-NMCA-034, ¶ 16, 274 P.3d 151 (quoting *Aragon*, 2010-NMSC-008, ¶ 26). Thus, whether Defendant's right to confrontation was violated depends on whether Dr. Barry related testimonial statements by Dr. Williams. *See State v. Navarette*,

10

2013-NMSC-003, ¶ 7, 294 P.3d 435 (deciding that the defendant's Confrontation Clause claim rested on whether the testimony of the forensic pathologist who did not perform the autopsy related any testimonial statements by the pathologist who performed the autopsy).

{16} In *Cabezuela*, our Supreme Court addressed a similar situation, also involving Dr. Barry, as the testifying expert in her capacity as the supervising forensic pathologist, while a different forensic pathologist fellow, Dr. Bracey, actually performed the autopsy. 2011-NMSC-041, ¶ 50. The *Cabezuela* Court ruled that there was no error in admitting Dr. Barry's testimony because the record showed "Dr. Barry had personal knowledge of and participated in making the autopsy report findings by virtue of her own independent participation in the microscopic exam, examination of the body and the injuries, and examination of all the photographs." *Id.* ¶ 52. The Court noted that the defendant "had a full and fair opportunity to cross-examine Dr. Barry to determine whether Dr. Barry had personal, first-hand knowledge of how Dr. Bracey conducted the autopsy and what Dr. Bracey found by observing the autopsy." *Id.*

{17} By contrast, our Supreme Court found a Confrontation Clause violation when the testifying forensic pathologist who did not perform the autopsy "relat[ed] subjective observations recorded in an autopsy report as a basis for the pathologist's

trial opinions, when the pathologist *neither participated in nor observed* the autopsy." *Navarette*, 2013-NMSC-003, ¶ 1 (emphasis added). In *Navarette*, the forensic pathologist's testimony as to his own conclusions based on his own observations from photographs of entry and exit wounds was permitted. *Id.* ¶ 22 (explaining that "an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause"). However, a Confrontation Clause violation resulted when he related other pathologist's finding of the absence of soot or stippling on the decedent because "[s]uch observations are not based on any scientific technique that produces raw data, but depend entirely on the subjective interpretation of the observer[.]" *Id.* ¶ 21.

{18}     Defendant contends that the trial court erred by permitting Dr. Barry to essentially read the contents of the autopsy report into the record in violation of his right to confrontation. The four cases Defendant cites in support of this statement, without explanation or argument, do not support his assertion that his confrontation right was violated. *See Gonzales*, 2012-NMCA-034, ¶ 25 (refusing "to toss a blanket ban on the testimony of an expert witness about the circumstances of the death of the victim in those instances when the expert did not perform the autopsy" and explaining that the admissibility in such situations depends on whether the testifying expert permissibly forms an independent opinion based on the underlying raw data or

12

impermissibly parrots the findings and conclusions of another expert); *Cabezuela*, 2011-NMSC-041, ¶ 52 (discussed above); *State v. Jaramillo*, 2012-NMCA-029, ¶¶ 1, 16, 272 P.3d 682 (holding that the autopsy report itself is inadmissible in cases where the doctor who actually performed the autopsy does not testify),[1] *cert. denied*, 2012-NMCERT-002, 291 P.3d 1290;  *State v. Delgado*, 2010-NMCA-078, ¶ 4, 148 N.M. 870, 242 P.3d 437 (concluding that the testimony of an analyst was improperly admitted when it was "not clear that she was stating her own opinion based on the underlying data and [the other analyst's] notes, but rather relaying [the other analyst's] opinion and stating her approval of it").

{19}     Here, Dr. Barry participated in the autopsy in the same manner as she did in *Cabezuela*.  She testified that in her role as the supervising forensic pathologist, she reviews the entire case with the fellow, examining the external body together, noting any injuries, and reviewing all of the photos and microscopics so that the resulting "autopsy report is a report of ours together." Dr. Barry explained that she performed an external examination of Baby Geovanny with Dr. Williams and described the skin scrape she observed. She also testified that she examined the inside of Baby Geovanny's body, personally observing the rib fracture, petechiae on the thymus, hemorrhages around the optic nerves, subdural hematoma on the dura of the brain, and

[1]The autopsy report itself was not admitted in the present case.

13

the subarachnoid hemorrhage on the brain. Dr. Barry also testified that she examined x-rays, photographs, and microscopics slides of Baby Geovanny's injuries.

{20}     Defendant's lengthy description of all of the tasks Dr. Barry did *not* perform during Baby Geovanny's autopsy is irrelevant to this inquiry.  How much she participated could go to the weight of her testimony, not its admissibility.  As we stated, the key question is whether Dr. Barry related any of Dr. Williams's observations or conclusions or whether she based any of her own conclusions on any of Dr. Williams's subjective observations.  Defendant cross-examined Dr. Barry at length about her observations and conclusions, and indeed attempted to discredit her medical opinion in several instances. Although Defendant makes the conclusory statement that "Dr. Barry merely 'parroted' Dr. Williams's findings into evidence," he fails to cite to any instance in the record where her testimony consisted of Dr. Williams's observations and conclusions rather than her own, and we could find none. Because our review of the record demonstrated that Dr. Barry testified as to her own personal observations and opinions and Defendant has not pointed to anything in the record that shows otherwise, we conclude there was no error in admitting Dr. Barry's testimony.

**3.     Exclusion of Character Evidence**

{21}     Defendant also argues that the trial court erred in not permitting Defendant to

14

introduce evidence of certain character traits.

**A.    Facts**

**{22}**    Defendant filed a motion in limine to determine the admissibility of substantive character evidence through twenty character witnesses who would testify as to Defendant's possession or lack of up to thirteen character traits. The State responded with a motion in limine to restrict the scope and quantity of the character evidence. At a hearing addressing these motions, the trial court ruled that three of the proposed character traits were pertinent: non-abusiveness, soft-heartedness for children, and calmness toward children, and found that the other character traits recited in Defendant's motion were not pertinent and would not be allowed.

**B.    Standard of Review**

**{23}**    "[T]he admission or exclusion of character testimony is committed to the sound discretion of the district court." *State v. Ruiz*, 2007-NMCA-014, ¶ 44, 141 N.M. 53, 150 P.3d 1003.  We therefore review the trial court's exclusion of certain character evidence for an abuse of discretion. *Id.*

**C.    Discussion**

**{24}**    "Generally speaking, evidence of a pertinent trait of character of the accused in a criminal case may be introduced through reputation or opinion testimony." *Ruiz*,

2007-NMCA-014, ¶ 45 (internal quotation marks and citations omitted); *see also State v. Martinez*, 2006-NMCA-148, ¶ 13, 140 N.M. 792, 149 P.3d 108 ("A criminal defendant is allowed to introduce pertinent traits of his good character under the exception in Rule 11-404(A)(1) [NMRA] out of concern for fairness."), *aff'd* 2008-NMSC-060, 145 N.M. 220, 195 P.3d 1232; Rule 11-404(A)(2); Rule 11-405(A) NMRA. "[P]roof of character, to be relevant, must be confined to the nature of the offense under charge and bear some pertinent analogy and reference to it." *State v. Martinez*, 2008-NMSC-060, ¶ 34, 145 N.M. 220, 195 P.3d 1232 (internal quotation marks and citation omitted).

{25}    Defendant asserts that the denied character evidence was pertinent to rebut the State's theory of the crime. He argues that he should have been able to introduce evidence of his patience and lack of being quick to anger to rebut the theory that he lost his patience with Baby Geovanny because she was fussy and either intentionally or negligently killed her. Assuming that evidence that Defendant was patient and even-tempered was relevant, it is within the discretion of the trial court to exclude relevant evidence if it is needlessly cumulative, and the court permitted testimony regarding his calmness and non-abusiveness. *See* Rule 11-403 NMRA.

{26}    In addition, in order to respond to the State's implication that Defendant's delay in calling 911 evidenced his guilty mind and contemplation of covering up his crime,

Defendant argues it was error to deny evidence that he is a simple person who does not plot and scheme. Defendant does not offer any explanation for how these traits are pertinent to the crime of child abuse negligently resulting in death or great bodily harm. Under these circumstances, we conclude that the trial court did not abuse its discretion.

**4.      Denial of Defendant's Motion for a Continuance**

{27}     Defendant next contends that the trial court erred in denying his motion to continue the trial so that his expert witness could testify in-person. We disagree.

**A.      Facts**

{28}     Jury selection in this case began on Thursday, February 11, 2010, and the trial was scheduled to run through Friday, February 26, 2010. Defendant had planned to call his expert, Dr. John Plunkett, to testify on Friday, February 19th. On February 16th, when the State indicated it was not sure that it would be finished with its case by Friday, the parties and the court decided it would be best to postpone Dr. Plunkett's testimony to the following Monday. When the court questioned whether defense counsel had set Dr. Plunkett's testimony for Monday, defense counsel responded that he planned to wait until Monday to inform Dr. Plunkett when to come. At no time during these discussions regarding moving Dr. Plunkett's testimony did defense counsel inform the court that Dr. Plunkett would not be able to testify during the

second week of trial.

{29} As it turned out, Dr. Plunkett planned to attend and speak at a conference in Seattle, Washington, during the second week of trial. As a result of Dr. Plunkett's scheduling conflict, Defendant filed a motion requesting to recess the trial from February 23, 2010, to March 1, 2010, to allow time for Dr. Plunkett to testify in person. In the motion, Defendant stated that he was "willing to entertain almost any other solution to this problem other than a forced resting of his case" including Dr. Plunkett testifying by phone or by video conference. Defense counsel told the court that video conferencing Dr. Plunkett's testimony would not be something he would be "in a position to object to." He also conceded that he had created the problem.

{30} The trial court refused to postpone the trial. However, it did accept Defendant's proposed remedy to arrange for Dr. Plunkett to testify via video conference. The State advised the court that Defendant needed to waive Dr. Plunkett's personal appearance. Defense counsel stated he was not aware of that requirement, but responded "I want [the video conference testimony] to happen. So to the extent I have to waive anything to make it happen, I'm going to waive it." Again, at the State's urging and after giving defense counsel time to confer with Defendant, the court addressed Defendant personally about waiving Dr. Plunkett's personal appearance, and Defendant agreed to waive Dr. Plunkett's personal appearance.

**B.    Standard of Review**

{31}    "The grant or denial of a motion for a continuance rests within the sound discretion of the trial court, and the burden of establishing an abuse of discretion rests with the defendant." *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20 (internal quotation marks and citation omitted).  "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case.  We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Salazar*, 2007-NMSC-004, ¶ 10, 141 N.M. 148, 152 P.3d 135 (internal quotation marks and citations omitted).  "[The d]efendant must establish not only an abuse of discretion, but also that the abuse was to the injury of the defendant." *Id.* (internal quotation marks and citation omitted); *see also State v. Salazar*, 2006-NMCA-066, ¶ 21, 139 N.M. 603, 136 P.3d 1013 ("The trial court has broad discretion in granting or denying a motion for a continuance, and absent a demonstrated abuse resulting in prejudice to the defendant, there is no basis for reversal." (internal quotation marks and citation omitted)).

**C.    Discussion**

{32}    In evaluating the denial of a motion to continue, we review whether the trial court considered a number of factors, which we refer to as the *Torres* factors.  1999-

NMSC-010, ¶ 10. Although not exclusive, *id.* ¶ 15, the *Torres* factors include

> the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion.

*Id.* ¶ 10.

{33} The record demonstrates that the trial court considered all of the *Torres* factors, and gave the following reasons for denying the continuance: the issue could have been avoided had defense counsel arranged for Dr. Plunkett to testify on Friday, February, 19th, as planned; Dr. Plunkett could have testified out of order, which was not requested, or he could have testified on Monday, February 22nd, but the court was not notified of a problem until late in the afternoon on February 22nd; that there have been a number of continuances in this matter previously, with the last one at Defendant's request in order to arrange for his experts to testify. In addition, the court had a murder trial scheduled for March 1st, which would have to be postponed; there were already a number of continuances in that matter; that defendant had the right to a speedy trial; and the prosecutor assigned to that case was being transferred to another district at the end of that week-long trial. Considering all of the above reasons for the trial court decision, we cannot characterize it "as clearly untenable or not justified by reason." *See Salazar*, 2007-NMSC-004, ¶ 10.

**{34}** Moreover, the record does not support a finding of prejudice. Defendant implies he was prejudiced by the court depriving him the opportunity to present his witness in-person. Even if the trial court's failure to rearrange its docket so that Dr. Plunkett could testify in-person could be construed as prejudicial, Defendant cannot complain. *See State v. Handa*, 1995-NMCA-042, ¶ 35, 120 N.M. 38, 897 P.2d 225 ("To allow a defendant to invite error and to subsequently complain about that very error would subvert the orderly and equitable administration of justice." (alterations, internal quotation marks, and citation omitted)). We conclude Defendant has not met his burden of establishing that the trial court abused its discretion.

**5.  Dr. Carole Jenny's Testimony as a Rebuttal Witness**

**{35}** Defendant raises three points of error related to the testimony by Dr. Carole Jenny, whom the State called as a witness to rebut the testimony of Defendant's expert, Dr. Plunkett. In the first point, Defendant argues that the trial court erred in permitting Dr. Jenny to testify as she was not a "true" rebuttal witness.

**A.  Facts**

**{36}** The State advised Defendant prior to trial of its intent to call Dr. Jenny, an expert in child abuse pediatrics, as a rebuttal witness to the testimony of Dr. Plunkett. Defendant objected to the admissibility of her testimony, arguing she was not a true rebuttal witness, and demanded an offer of proof by the State on what new matters

21

were raised by Dr. Plunkett that required rebutting by the State. At the trial court's request, the State made a proffer, detailing the points from Dr. Plunkett's testimony the State planned to rebut through Dr. Jenny. The court ruled that Dr. Jenny was allowed to testify as a rebuttal witness for the State.

**B.    Discussion**

{37}    "Genuine rebuttal evidence is not simply a reiteration of evidence in chief but consists of evidence [o]ffered in reply to new matters." *State v. Manus*, 1979-NMSC-035, ¶ 38, 93 N.M. 95, 597 P.2d 280 (internal quotation marks and citation omitted), *overruled on other grounds by Sells v. State*, 1982-NMSC-125, 98 N.M. 786, 653 P.2d 162. "The State is entitled to correct false impressions given to a jury by the defense through rebuttal testimony." *State v. Simonson*, 1983-NMSC-075, ¶ 31, 100 N.M. 297, 669 P.2d 1092. "Determining what is true rebuttal evidence, however, can be difficult. Frequently true rebuttal evidence will, in some degree, overlap or coalesce with the evidence in chief. Therefore, the question of admissibility of evidence on rebuttal rests largely on the trial court's discretion." *State v. Dominguez*, 2007-NMSC-060, ¶ 26, 142 N.M. 811, 171 P.3d 750 (internal quotation marks and citation omitted), *holding modified on other grounds by State v. Garcia*, 2011-NMSC-003, 149 N.M. 185, 246 P.3d 1057. We will not disturb the admission of rebuttal evidence on appeal "absent an abuse of that discretion." *Id.* ¶ 25.

{38} The State asserts that Defendant's claim is unsupported by argument and should therefore be deemed abandoned. We agree. Defendant fails to cite to any point in the record to support his conclusory statement that "Dr. Jenny added nothing in rebuttal." *See Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 (refusing to respond to appellant's "surface presentation" and stating that "[w]e will not search the record for facts, arguments, and rulings in order to support generalized arguments").

**6.     Dr. Jenny's Alleged Perjury**

{39} In Defendant's second point of error related to Dr. Jenny's testimony, he argues that the trial court erred in denying his motion for a new trial on the ground that Dr. Jenny had perjured herself by testifying that she had reviewed all of the slides retained in the case.

**A.     Facts**

{40} OMI prepared fifteen slide blocks containing microscopics of Baby Geovanny's tissues showing her injuries. These are the slides that Dr. Barry reviewed in reaching her opinions. On February 2, 2010, the court ordered OMI to send five of the slide blocks to Defendant's expert, Dr. Plunkett. These were the original and only slide blocks OMI possessed. Under court order, the slides were supposed to be returned to OMI by February 12, 2010, so that they would be available during the trial. On

23

February 23, 2010, the State had informed the trial court that OMI had not received the slides. Defense counsel assured the court that they had been sent via overnight mail and the problem was "on me."

{41} On February 24, 2010, Dr. Jenny flew into Albuquerque and went to the OMI to review the slides. Dr. Jenny testified the next day. In response to the State's question about what she had done in order to prepare her testimony, Dr. Jenny testified that she "went to [OMI] and looked at all the pathological slides that were retained from the case" on the previous evening. Prior to that, she had only read the report on the slides, but had not actually reviewed the slides themselves.

{42} In fact, when Dr. Jenny reviewed the slides at OMI, the five slide blocks that OMI had sent to Defendant's experts still had not been returned as promised. Defendant's expert had sent the slides to defense counsel rather than to OMI, but there is no evidence in the record indicating when defense counsel became aware that there was a package for him at the post office waiting to be picked up.

{43} The State told defense counsel on March 1, 2010, that OMI had informed the State that the slide blocks had not yet been returned. Defendant reported this information to the court and signaled his intent to move for a new trial based on this issue if the jury returned a guilty verdict. When the guilty verdict was returned, Defendant filed a motion for a new trial based, in part, on Dr. Jenny's alleged perjury.

24

The trial court found that there was "no evidence that Dr. Jenny committed perjury" and denied the motion. We affirm.

**B.    Standard of Review**

{44}    "The trial court has broad discretion in granting or denying a motion for new trial, and such an order will not be reversed absent clear and manifest abuse of that discretion."  *State v. Guerra*, 2012-NMSC-027, ¶ 18, 284 P.3d 1076 (internal quotation marks and citation omitted); *see also State v. Huber*, 2006-NMCA-087, ¶ 27, 140 N.M. 147, 140 P.3d 1096 ("We will not disturb the trial court's denial of a motion for a new trial unless the ruling is arbitrary, capricious or beyond reason." (internal quotation marks and citation omitted)).  Again, we will not find an abuse of discretion unless the trial court decision "is clearly against the logic and effect of the facts and circumstances of the case" and therefore "clearly untenable or not justified by reason." *Salazar*, 2007-NMSC-004, ¶ 10.

**C.    Discussion**

{45}    "Perjury consists of making a false statement under oath, affirmation or penalty of perjury, material to the issue or matter involved in the course of any judicial . . . proceeding or matter, knowing such statement to be untrue."  NMSA 1978, § 30-25-1(A) (2009).  Although "a defendant should be granted a new trial if perjury of a material witness against him is later discovered" it is imperative that courts "act with

25

great reluctance and with special care and caution before accepting the truth of a claim of perjury." *State v. Betsellie*, 1971-NMSC-076, ¶ 12, 82 N.M. 782, 487 P.2d 484. The evidence must "affirmatively establish the perjury in such clear and convincing manner as to leave no room for reasonable doubt that perjury was committed." *Id.*

{46} Defendant argues that the trial court erred in denying his motion for a new trial based on Dr. Jenny's alleged perjury. His argument appears to be solely based on the fact that Dr. Jenny said she saw all the slides retained in the case when in fact she only saw the slides in OMI's possession and OMI did not have all of the slides in its possession. The trial court found that Dr. Jenny testified that she had reviewed all of the slides "that were *retained* from the case" and that OMI had not "retained" the missing slides since it had sent them to the defense expert. However, even if her statement could be construed to be factually untrue, it does not constitute perjury unless she "[knew] such statement to be untrue" when she said it. Section 30-25-1(A). There is no evidence in the record that Dr. Jenny was not aware she had not seen all of the slides in the case. Defendant fails to meet his burden, pointing to no evidence, let alone "clear and convincing" evidence, that perjury was committed. The trial court did not abuse its discretion in denying Defendant's motion for a new trial.

**7.    Exculpatory Evidence**

26

{47} Finally, Defendant argues that the district court erred in denying his motion for a new trial based on the State's alleged *Brady* violation.

**A. Facts**

{48} In addition to the perjury allegations, Defendant's motion for a new trial also set forth grounds for a new trial arguing that if the State knew that Dr. Jenny had not reviewed all of the slides, it was required to disclose that information prior to Dr. Jenny's testimony. The trial court found that there was "nothing to indicate" that the State had withheld information about the missing slides from Defendant and denied the motion on this ground as well.

**B. Standard of Review**

{49} As we did for the previous issue, we review the denial of a motion for a new trial for an abuse of discretion. *Guerra*, 2012-NMSC-027, ¶ 18.

**C. Discussion**

{50} Defendant's argument rests on the State's duty to turn over exculpatory evidence to the defendant in a criminal case. *See* Rule 5-501(A)(6) NMRA ("[T]he state shall disclose or make available to the defendant . . . any material evidence favorable to the defendant which the state is required to produce under the due process clause of the United States Constitution."); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused

upon request violates due process where the evidence is material either to guilt or to punishment"). He begins by asserting, "*If* the State knew, prior to her testimony, that Dr. Jenny had not reviewed 'all the slides,' the State was required to turn over that information prior to Dr. Jenny's examination." (Emphasis added.) And he concludes the discussion on this issue by stating, "The State knew that Dr. Jenny had not reviewed all of the slides." At no point in between does Defendant point to any evidence in the record that would support the transition from mere speculation to fact. He thus fails to rebut the district court's finding that there was nothing to show that the State knew prior to Dr. Jenny's testimony that she had not reviewed all of the slides in the case. Therefore, Defendant has not met his burden and we again conclude the trial court did not abuse its discretion.

**CONCLUSION**

{51}    The trial court is affirmed.

{52}    **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Judge**

28

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**


_____
**LINDA M. VANZI, Judge**